# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| SCHOOL SPECIALTY, LLC, | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| UNITED STATES, | ) | Before: The Honorable M. Miller Baker |
| Defendant, | ) | |
| and | ) | Court No. 24-00098 |
| DIXON TICONDEROGA COMPANY, | ) | |
| Defendant-Intervenor. | ) | |

## SCHOOL SPECIALTY, LLC'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, School Specialty, LLC ("School Specialty"), respectfully moves this Court for an order granting judgment on the agency record against Defendant, the United States. School Specialty is entitled to judgment in its favor, as explained in the accompanying memorandum of law.

WHEREFORE, School Specialty respectfully moves this Court to enter an order granting its motion for judgment on the agency record, setting aside as unlawful the final determination of the U.S. Department of Commerce challenged herein, and remanding the final determination for reconsideration in accordance with the Court's decision.

Respectfully submitted,

/s/ Nithya Nagarajan
Nithya Nagarajan
Jamie L. Shookman
HUSCH BLACKWELL LLP
1801 Pennsylvania Avenue, NW,
Suite 1000
Washington, DC 20006
nithya.nagarajan@huschblackwell.com
jamie.shookman@huschblackwell.com
(202) 378-2409
*Counsel for School Specialty, LLC*

Dated: November 8, 2024

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SCHOOL SPECIALTY, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES, | ) Before: The Honorable M. |
| | ) Miller Baker |
| Defendant, | ) |
| | ) Court No. 24-00098 |
| and | ) |
| | ) PUBLIC VERSION |
| DIXON TICONDEROGA | ) |
| COMPANY, | ) |
| | ) |
| Defendant-Intervenor. | ) |

## SCHOOL SPECIALTY LLC'S MEMORANDUM IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Nithya Nagarajan
Jamie L. Shookman
HUSCH BLACKWELL LLP
1801 Pennsylvania Avenue, NW,
Suite 1000
Washington, DC 20006
nithya.nagarajan@huschblackwell.com
jamie.shookman@huschblackwell.com
(202) 378-2409
*Counsel for School Specialty, LLC*

Dated: November 8, 2024

TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................... 1

      A.    Administrative Decision Under Review ................................ 1

      B.    Issues Presented ............................................................... 1

II.   SUMMARY OF THE ARGUMENT ............................................. 2

III.  STATEMENT OF FACTS ........................................................... 4

      A.    The Antidumping Order on Cased Pencils ........................... 4

      B.    School Specialty's Scope Application .................................. 4

      C.    Commerce's Scope Inquiry ................................................ 8

      D.    Commerce's Scope Determination ..................................... 10

IV.   STANDARD OF REVIEW ......................................................... 14

V.    ARGUMENT .......................................................................... 17

      A.    Commerce's Application of The Substantial
            Transformation Test Was Contrary to Law and
            Unsupported by Substantial Evidence, as it
            Disregarded Relevant Factors and Relied on Other
            Factors Absent from its Governing Test ........................... 17

      B.    Commerce's Final Scope Ruling Was Unsupported by
            Substantial Evidence and Contrary to Law, Because It
            Failed to Consider A CBP Ruling Directly on Point
            That Fairly Detracted From its Weight ............................. 36

VI.   CONCLUSION ....................................................................... 42

# TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*Ad Hoc Shrimp Trade Action Comm. v. United States,*
  802 F.3d 1339 (Fed. Cir. 2015)............................................................16

*Bell Supply Co., LLC v. United States,*
  348 F. Supp. 3d 1281 (Ct. Int'l Trade 2018)........... 17, 20, 21, 30, 31, 32

*Bell Supply Co., LLC v. United States,*
  888 F.3d..........................................................................................25, 30

*Consol. Edison Co. v. NLRB,*
  305 U.S. 197 (1938) ..........................................................................15

*Crawfish Processors Alliance v. United States,*
  483 F.3d 1358 (Fed. Cir. 2007)........................................................15, 41

*CS Wind Vietnam Co., Ltd. v. United States,*
  832 F.3d 1367 (Fed. Cir. 2016)............................................................16

*Diamond Sawblades Manufacturers' Coal. v. United States,*
  540 F. Supp. 3d 1338 (Ct. Int'l Trade 2021) ........................................16

*Gerald Metals Inc. v. United States,*
  132 F.3d 716 (Fed. Cir. 1997)..........................................................15, 16

*Huvis Corp. v. United States,*
  570 F.3d 1347 (Fed. Cir. 2009)............................................................37

*King Supply Co., LLC v. United States,*
  674 F.3d 1343 (Fed. Cir. 2012)............................................................16

*Shandong Rongxin Imp. & Exp. Co. v. United States,*
  163 F. Supp. 3d 1249 (Ct. Int'l Trade 2016) ...................................15, 16

*SolarWorld Americas, Inc. v. United States,*
   910 F.3d 1216 (Fed. Cir. 2018) .......................................................37, 38

*SunEdison, Inc. v. United States,*
   179 F. Supp. 3d 1309 (Ct. Int'l Trade 2016) ........................................22

*Universal Camera Corp. v. NLRB,*
   340 U.S. 474 (1951) ...............................................................................15

*Worldwide Door Components, Inc. v. United States,*
   No. 2023-1532, 2024 WL 4439233 (Fed. Cir. Oct. 8, 2024)............16, 37

<u>Statutes and Regulations</u>

119 U.S.C. § 1516a(a)(2)(B)(vi) .................................................................14, 15

19 U.S.C. § 1516a(b)(1)(B) ..............................................................................15

19 CFR § 134.1(b) ..............................................................................................9,

19 C.F.R. § 351.225..........................................................................................15

19 CFR § 351.225(f)(3) ....................................................................................35

19 CFR § 351.225(j)(1) ...............................................................................11, 12

19 CFR  §351.225(j)(1)(ii) ...............................................................................22

19 CFR § 351.225(j)(1)(iii) ..............................................................................28

19 C.F.R. § 351.225(j)(2) ...............................................................11, 12, 17, 22

 Other Authorities

*Antidumping Duty Order: Certain Cased Pencils from the People's Republic of China,*
    59 FR 66909 (December 28, 1994)................................................*passim*

*Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws,*
    86 F.R. 52,300 (Sept 20, 2021) .............................................................25

# I.    INTRODUCTION

On behalf of School Specialty, LLC ("School Specialty" or "Plaintiff"), we respectfully submit the following brief in support of Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record.

## A.    Administrative Decision Under Review

The administrative determination sought to be reviewed in this case is the U.S. Department of Commerce's ("Commerce") Final Scope Ruling, *Certain Cased Pencils from the People's Republic of China: Scope Ruling on Products Produced by School Specialty, LLC in the Philippines* (Case No. A-570-827) ("Final Scope Ruling"), issued on May 6, 2024. *See* Appx000420-000434.

## B.    Issues Presented

1. Whether Commerce's determination that raw material inputs for the manufacture of the inquiry merchandise were not substantially transformed in the Philippines was unsupported by substantial evidence and contrary to law, as Commerce failed to conduct a fulsome and complete analysis of the substantial transformation factors set forth in its regulations, predetermined the its conclusion that prefabrication of the inputs precludes substantial transformation, proceeded to disregard the significant changes in

character and use imparted in the Philippines, and then failed to

explain the reasonableness and weight of each factor?

2. Whether the Final Scope Ruling was unsupported by substantial

evidence because Commerce failed to consider evidence that fairly

detracted from its conclusions, specifically a contradictory

determination by U.S. Customs and Border Protection regarding the

origin of the same cased pencils imported by School Specialty?

## II.    SUMMARY OF THE ARGUMENT

This case is brought by School Specialty, an importer of pencils

whose primary customers are public school districts in the United

States.  At issue is whether raw material inputs from China that are

<u>not</u> writing or drawing instruments are substantially transformed in

the Philippines when they are processed into downstream, finished

pencils through a series of sophisticated manufacturing steps that

significantly change their physical characteristics and use.

In deciding this issue, Commerce ignored that a substantial

transformation analysis should be case-specific and consider the factors

relevant to the inquiry merchandise.  Commerce instead employed a

one-size-fits-all model whereby components with a predetermined use

can never be substantially transformed. Then, working backward, it attempted to justify this conclusion within an ill-fitting rubric comprised of the substantial transformation factors set forth in its regulations.

What resulted was a deeply flawed analysis untethered from the facts of this case. First in analyzing the "class or kind" factor, Commerce determined that raw material inputs transform into a different class or kind when manufactured into finished pencils in the Philippines, but it failed to explain how such a transformation is not "substantial." Commerce also disregarded the multiple, significant manufacturing steps that occur in the Philippines and focused almost entirely on certain components being "prefabricated" in China, despite no support for such an analysis in its governing regulations or the relevant case law. This approach undoubtedly rendered the Final Scope Ruling unsupported by substantial evidence and contrary law.

Commerce also failed to consider a determination by U.S. Customs and Border Protection ("CBP") finding that the exact same products are country of origin Philippines. The failure to consider such critical record evidence that detracted from Commerce's own conclusion also

rendered the Final Scope Ruling unsupported by substantial evidence and contrary to law.

## III.  STATEMENT OF FACTS

### A.  The Antidumping Order on Cased Pencils

This case concerns the scope of the antidumping duty order on certain cased pencils from the People's Republic of China ("China").  *See Antidumping Duty Order: Certain Cased Pencils from the People's Republic of China*, 59 FR 66909 (December 28, 1994) ("Cased Pencils Order").  The Cased Pencils Order covers in pertinent part:

> {C}ertain cased pencils of any shape or dimension (except as described below) which are *writing and/or drawing instruments* that feature *cores of graphite* or other materials, encased in wood and/or man-made materials, whether or not decorated and whether or not tipped (e.g., with erasers, etc.) in any fashion, and either sharpened or unsharpened.

(emphasis added).

### B.  School Specialty's Scope Application

On June 7, 2023, School Specialty requested a scope ruling ("Scope Application") to determine whether certain #2 pencils, drawing pencils, and colored pencils manufactured and imported from the Philippines to the United States are within the scope of the Cased Pencils Order, which only covers certain cased pencils from China. *See* Appx000001-

000239. School Specialty sells the pencils at issue primarily to public school districts in the United States. Appx000019.

The Scope Application explained that the imported pencils are writing and drawing instruments produced in Philippines from the following raw material inputs: raw wooden slats (China); graphite Core (China); colored Core (China); ferrule (China); eraser (China); paint and lacquer (Philippines); glue (Philippines) and packing materials (Philippines). Appx000073. In addition, all the labor associated with the manufacture and assembly of the pencils as finished goods occur in the Philippines. *See id.,* Appx000013-000018, Appx000079-000104.

The Scope Application explained that the raw material inputs undergo multiple phases of manufacturing in the Philippines. First, the pencil construction phase consists of the following manufacturing steps:

- Grooving: Construction begins by placing raw wooden slats onto a grooving machine and cutting **[            ]** into the raw wooden slats on a grooving machine.

- Sandwiching: The grooved slats are moved to a gluing machine, where they pass under a glue applicator that places glue onto the slats. The core is then placed into the grooves and a slat is placed

on top, sandwiching the core between two grooved wooden slats. Until the core is placed within the grooved wooden slats, the functionality of a pencil is not achieved. The pencil sandwiches are then placed onto a machine press that compresses and squeezes the sandwiches together while the glue dries.

- Shaping: the dried pencil sandwiches are then processed in a pencil shaping machine that creates nine hexagonal or round shaped pencils, thereby fully transforming the shape of the rectangular-shaped pencil sandwiches that were fed into the machine.

- Sanding: each pencil is placed into a large mechanical tumbler which rubs them together to create friction that sands the pencil exteriors smooth.

*Id.*, Appx000015-000016, Appx000079-000104.

Next, the pencil finishing stage takes place in a separate building in the Philippines, where the following steps occur:

- Varnishing: in this step, the pencils receive several coats of paint/lacquer, which corresponds to the pencil type described above.

- Heading: a heading machine sands the ends of the now varnished pencils.

- Stamping: registered marks are stamped onto the end of the pencils, drawing pencils are stamped with a lead hardness indicator, and #2 pencils receive a "2" stamp.

- Tipping: a tipping machine assembles the ferrule (aluminum tip that connects the pencil to the eraser) to the end of the pencil and affixes an eraser to the ferrule. Colored and drawing pencils are not tipped.

- Sharpening: colored pencils, drawing pencils and #2 pencils sold as "pre-sharpened" are next sharpened in a pencil sharpening machine.

- Packaging: the pencils are packed into boxes shipping.

*Id.*, Appx000016-000017, Appx000079-000104.

In sum, the Scope Application demonstrated that cumulatively, all pencil construction and finishing steps that are required to manufacture finished pencils from raw material inputs physically occur in the Philippines and do not occur in any other country.

The Scope Application also explained that none of the raw inputs can be used as writing or drawing instruments, and that the critical step of inserting the finished pencils' core occurs during the pencil

construction manufacturing stage in the Philippines. Appx000021.

Prior to these critical manufacturing steps, the components are merely

unprocessed inputs with which no user would expect to write or draw.

*Id.*

As a result of the significant manufacturing that occurs during the

numerous pencil construction and finishing steps, School Specialty

asked Commerce to determine that the raw inputs undergo a

substantial transformation in the Philippines, such that the imported

pencils are country of origin of the Philippines and outside the scope of

the Cased Pencils Order. *Id.*, Appx000019-000021.

### C.    Commerce's Scope Inquiry

On July 10, 2023, Commerce initiated its scope inquiry to

determine whether School Specialty's cased pencils are within the scope

of the Cased Pencils Order.  Petitioners submitted comments on the

scope application on August 9, 2023, Appx000249-000271 ("Petitioners

Comments"), and School Specialty submitted rebuttal comments on

August 30, 2023, Appx000272 -000301 ("Rebuttal Comments").

In its Rebuttal Comments, School Specialty attached a ruling

issued by CBP after the Scope Application. Appx000299-000301.  In

Ruling N333392, issued on June 28, 2023, CBP determined the country-of-origin of the same three categories of pencils (#2 pencils, drawing pencils, and colored pencils) imported by the same company (School Specialty) as the pencils at issue in the Scope Application. *Id.*

CBP determined in Ruling N333392, under Section 134.1(b) of the Customs Regulations (19 CFR 134.1(b)), that the country of origin of the imported pencils is the Philippines, explaining that:

> The **work performed in the Philippines** on the various components that are made in China and shipped to the Philippines for manufacture into the completed pencils **have effected a substantial transformation of those components** and, therefore, the country of origin of the imported pencils is the Philippines.

*Id.*, Appx000287. (emphasis added).  School Specialty explained that while Commerce is not bound by this ruling, it was informative "given that it involves the same products involved in this instant Scope Application." *Id.*

On March 25, 2024, petitioners submitted for the record CBP's final determination as to evasion in Enforce and Protect Act ("EAPA") Case No. 7238. *See* Appx000324-000374. On April 5, 2024, School Specialty submitted rebuttal comments to petitioner's submission. Appx000416-000419 ("EAPA Rebuttal").

School Specialty noted in its comments that the EAPA case should have no bearing on the Scope Application, because it involved *finished* pencils imported from China to the Philippines and repackaged into boxes labeled "Made in Philippines." Appx000417.  In stark contrast, School Specialty's Scope Application involved raw material inputs imported to the Philippines, where they are manufactured into finished pencils after undergoing a series of manufacturing steps that transform their character and use.  *Id.*

During its scope inquiry, Commerce did not issue any questionnaires to the parties, nor did it seek clarification of any information in the record.

### D.    Commerce's Scope Determination

On May 6, 2024, Commerce issued its Final Scope Ruling, finding that School Specialty's imported pencils are covered by the scope of the Cased Pencils Order. Appx000433-000434.  The Final Scope Ruling first noted that the cased pencils imported from Philippines meet the physical description of the order. Appx000428.  At issue, therefore, was the pencils' origin, as the Cased Pencils Order is limited and specific to

pencils from China and does not cover pencils manufactured in a third country from raw material inputs.

To answer this question, Commerce purportedly applied its substantial transformation test set forth in 19 CFR §351.225(j)(1), which includes the following factors: (i) whether the processed downstream product is a different class or kind of merchandise than the upstream product; (ii) (the physical characteristics (including chemical, dimensional, and technical characteristics) of the product; (iii) the intended end-use of the downstream product; (iv) the cost of production/value added of further processing in the third country; (v) the nature and sophistication of processing in the third country or countries; and (vi) the level of investment in the third country or countries. *Id.,* Appx000423.

While Commerce noted that it may also consider "where the essential component of the product is produced or where the essential characteristics of the product are imparted." *Id.,* Appx000423 (discussing 19 C.F.R. § 351.225(j)(2)). At no point did Commerce explain that a substantial transformation test must be tailored to each case, and that its regulations instruct determining origin based on

"relevant factors that arise on *a case-by-case basis*."  19 C.F.R. §

351.225(j)(1) (emphasis added).

Starting with the "class or kind of merchandise" factor, Commerce

determined that "the cased pencil inputs are transformed into a

different class or kind of merchandise" in the Philippines. *Id.,*

Appx000429.  While correctly finding that this factor weighed in favor

of substantial transformation, Commerce provided no analysis as to

how it weighed this factor against other competing factors, or how it

ultimately determined that transforming out-of-scope inputs into

finished pencils of a different class or kind was not "substantial" enough

for the Philippines to impart the inquiry merchandise's country of

origin.

Next, Commerce illogically combined its analysis of the "physical

characteristics" factor with its analysis of "essential characteristics," a

factor found several sub-provisions later in 19 CFR §351.225(j)(2).  *Id.,*

Appx000430.  Then, focusing only on wooden slats—a component with

which a user could *never* write or draw—Commerce concluded that the

essential characteristics of this component are imparted in China. *Id.*

This analysis blatantly ignored that the "essential characteristics" of a

finished pencil is not its wooden slats, but the "sandwiched" graphite core through which multiple components transform into a writing or drawing instrument.

In analyzing the "intended use" factor, Commerce improperly focused only on the fact that the raw material inputs were intended for pencil production in the Philippines. *Id.,* Appx000431-000432. Commerce cited no support for ignoring the fact the raw material inputs cannot be used to write or draw, simply because they undergo some level of prefabrication in China.

As for the "nature/sophistication of processing in third country" factor, Commerce disregarded the numerous sophisticated machines housed in multiple buildings that are used to manufacture the imported pencils. *Id.,* Appx000432. Commerce once again focused on the raw material components' "prefabrication" in China, but again failed to explain this fact's relevance to evaluating the sophistication of processing in the Philippines, or how it supports completely discounting the numerous, critical manufacturing steps involved in transforming raw material inputs into finished pencils. *Id.*

13

Finally, as for the "level of investment" factor, Commerce found that it had insufficient information to determine whether the cost of production in the Philippines represents substantial transformation. In so concluding, Commerce failed to analyze relevant record evidence or solicit any additional information. *Id.,* Appx000433.

Commerce ultimately concluded, based on "the totality of the factors considered in the analysis of the substantial transformation criteria," that the raw inputs are not substantially transformed in the Philippines, and that the pencils imported by School Specialty therefore remain country of origin of China. *Id.,* Appx000433. Missing from its analysis was any explanation as to how it reached this conclusion, how it weighed the competing factors, or what sort of manufacturing would have resulted in a substantial transformation.

This appeal followed.

## IV.  STANDARD OF REVIEW

The Court may review a determination by Commerce "as to whether a particular type of merchandise is within the class or kind of merchandise described in an existing finding of dumping or antidumping or countervailing duty order."  19 U.S.C. § 1516a(a)(2)

(B)(vi).  Such a determination is known as a "scope ruling."  19 C.F.R. §
351.225.

The Court holds unlawful any scope determination that is
"unsupported by substantial evidence on the record or otherwise not in
accordance with law."  19 U.S.C. § 1516a(b)(1)(B)).  "'Substantial
evidence' means 'such relevant evidence as a reasonable mind might
accept as adequate to support a conclusion.'"  *Crawfish Processors
Alliance v. United States,* 483 F.3d 1358, 1361 (Fed. Cir. 2007) (quoting
*Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *see also
Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477 (1951).

Substantial evidence is "more than a mere scintilla."  *Consol.
Edison Co.*, 305 U.S. at 229.  "{T}he substantial evidence standard
requires more than mere assertion of 'evidence which in and of itself
justified {the ... determination}, without taking into account
contradictory evidence or evidence from which conflicting inferences
could be drawn.'"  *Shandong Rongxin Imp. & Exp. Co. v. United States*,
163 F. Supp. 3d 1249, 1252-53 (Ct. Int'l Trade 2016) (quoting *Gerald
Metals Inc. v. United States,* 132 F.3d 716, 720 (Fed. Cir. 1997)).

"The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *CS Wind Vietnam Co., Ltd. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (quoting *Gerald Metals*, 132 F.3d at 720); *see also Shandong Rongxin*, 163 F. Supp. 3d at 1252. In reviewing scope determinations, the Court reviews "the record before Commerce in the particular proceeding at issue and includes all evidence that supports and detracts from Commerce's conclusion." *Worldwide Door Components, Inc. v. United States*, No. 2023-1532, 2024 WL 4439233, at *6 (Fed. Cir. Oct. 8, 2024) (quoting *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1348 (Fed. Cir. 2015)).

Although "Commerce is entitled to substantial deference with regard to its interpretations of its own antidumping duty order . . . {t}his broad deference is not unlimited ... 'Commerce cannot interpret an antidumping order so as to change the scope of that order, nor can Commerce interpret an order in a manner contrary to its terms.'" *Diamond Sawblades Manufacturers' Coal. v. United States*, 540 F. Supp. 3d 1338, 1342 (Ct. Int'l Trade 2021) (quoting *King Supply Co., LLC v. United States*, 674 F.3d 1343, 1348 (Fed. Cir. 2012)).

## V.    ARGUMENT

For the reasons explained below, the Court should find that the Final Scope Ruling is unsupported by substantial evidence and not in accordance with law.

### A.    Commerce's Application of The Substantial Transformation Test Was Contrary to Law and Unsupported by Substantial Evidence, as it Disregarded Relevant Factors and Relied on Other Factors Absent from its Governing Test

Commerce's regulations instruct that a product's origin should be determined by the "relevant factors that arise *on a case-by-case basis*." 19 C.F.R. § 351.225(j)(2) (emphasis added); *see also Bell Supply Co., LLC v. United States*, 348 F. Supp. 3d 1281, 1293 (Ct. Int'l Trade 2018).

Though Commerce's regulations set forth factors that it may consider, they must necessarily be tailored to each case.  Thus, picking a single factor—like whether an individual component has a predetermined use—and applying it to preclude substantial transformation regardless of the specific facts and product involved, would undoubtedly be unsupported by substantial evidence and contrary to law.

However, that is exactly what Commerce did here.  Through a series of legal and factual errors, Commerce demonstrated that it did

not intend to conduct a careful, well-reasoned substantial transformation analysis tailored to the facts of this case. Rather, Commerce based its finding that no substantial transformation occurred on the fact that certain components were prefabricated in China, and then it hastily tried to craft post-hoc reasoning for its outcome within the framework of the substantial transformation factors.

Commerce's reasoning started with the unequivocal conclusion that the raw material inputs from China were (1) out-of-scope as individual components but (2) transformed into goods of a different class or kind in the Philippines. Remarkably, though, Commerce never explained how this significant transformation from out-of-scope inputs into finished pencils of a different class or kind was not "substantial" enough to effectuate a substantial transformation.

Inexplicably, Commerce jumped right into the other factors, all of which amounted to different recitations of its conclusion that prefabrication in China had occurred. Specifically, in considering (1) the physical characteristics and essential characteristics of the product; (2) intended end use; and (3) nature and sophistication of processing,

Commerce largely relied on certain raw material inputs undergoing "prefabrication" in China—a factor appearing nowhere in its regulations—and ignored the significant changes imparted by the numerous manufacturing steps in the Philippines.  Finally, in analyzing the cost of production and level of investment, Commerce ignored record evidence and failed to request any supplemental or clarifying information.

Below, we walk through each of the factors in Commerce's analysis and explain in more detail why its reasoning was unsupported by substantial evidence and contrary to law.

1.    Class or Kind

Commerce concluded in the Final Scope Ruling that pencil inputs are not covered by the Cased Pencils Order, explaining that:

> The cased pencil **inputs are not included within the scope** of the Order and **cannot be used as a writing or drawing instrument**. Therefore, through processing, the cased pencil inputs are transformed into a different class or kind of merchandise.

*Final Scope Ruling*, Appx000429 (emphasis added).  Likewise, in another prior scope ruling, Commerce found that a "writing instrument" with "a core of graphite that is encased in wood . . . matches the description of those products subject to the {Cased Pencils Order}."

*Scope Application*, Appx000229. These findings demonstrate that Commerce consistently treats raw inputs as distinct from finished pencils for purposes of determining the order's scope.

As Commerce itself noted in the Final Scope Ruling, class or kind "serves, generally, as an indicator of the degree of transformation." Appx000429. Nevertheless, Commerce failed to explain how transforming inputs from one class or kind of merchandise to another did not rise to the requisite level of transformation. Specifically, Commerce failed to explain how it weighed the "class or kind" factor against other competing factors, and why in this case, "class or kind" did not indicate that a substantial transformation had occurred. Nor did Commerce explain what processes *would* have risen to the level of substantial transformation. Effectively, Commerce in contravention to the holding in *Bell Supply*, changed the scope of the Cased Pencils Order in a manner that was contrary to its terms.

As this Court has explained, "{al}though a totality of the circumstances analysis eschews bright line rules for balancing, Commerce must explain how each factor weighs in the balance and why." *Bell Supply*, 348 F. Supp. 3d at 1295. In the *Bell Supply* case, for

20

example, the Court found a final scope ruling unsupported by substantial evidence in part due to Commerce's failure "to explain how three of the factors upon which it relies support its determination." *Id.* at 1289. The Court remanded Commerce's final scope ruling for further explanation or reconsideration, explaining that:

> The failure to explain the reasonableness and weight of each factor results in an "I know it when I see it test," which is no test at all.

*Id.* at 1295.

Here too, Commerce failed to explain the reasonableness and weight of the "class or kind" factor. The lack of explanation rendered its purported application of the substantial transformation test into an "I know it when I see it" test, which should be a basis for remanding the Final Scope Ruling.

    2.    Physical Characteristics and Essential Characteristics of the Product

Commerce failed to follow a logical sequence of steps in analyzing this factor. Before even commencing its analysis, Commerce had predetermined that it was going to conclude that there was no substantial transformation and then worked backwards to try and justify the result. *Final Scope Ruling*, Appx000430.

21

Specifically, Commerce combined its analysis of the "physical characteristics" factor, set forth in 19 CFR §351.225(j)(1)(ii), with its analysis of the product's "essential characteristics," a factor found several sub-provisions later in 19 CFR §351.225(j)(2). *Id.* Then, focusing only on the pencils' wooden slats, Commerce determined that their essential characteristic is "to be used specifically for pencil production and associated production machinery," which are characteristics imparted in China. *Id.* As a result, it concluded that the wooden slats "retain their original general physical and essential characteristics" in the Philippines, which weighs against finding substantial transformation. *Id.* Commerce then ignored all the other components required to make a pencil and pencil which is fundamentally a writing or drawing instrument. This analysis was deeply flawed if not woefully incomplete.

Commerce's regulations state that it may consider "where the essential characteristics of *the product* is produced," 19 CFR §351.225(j)(1)(ii), not the essential characteristics of only a single input. *Id.,* Appx000430; *see also SunEdison, Inc. v. United States*, 179 F. Supp. 3d 1309, 1322 (Ct. Int'l Trade 2016) (no substantial transformation

where "solar panel assembly does not change the nature or use of the product's essential component, the solar cell").

Importantly, the essential characteristics of a finished pencil, which is the product at issue, is the pencil sandwich manufactured in the Philippines, as it contains a graphite core encased in wood. *Rebuttal Comments*, Appx000278; *see also* Cased Pencils Order (description of covered merchandise). Without this component, the pencils at issue would not be a "writing" or "drawing instrument" covered by the scope of the Cased Pencils Order. *Final Scope Ruling*, Appx000429. Nor would any of School Specialty's customers accept raw material inputs in place of the finished pencils themselves. Focusing on the so-called "essential characteristics" of only the wooden slats, with which no user could write or draw, was clearly nonsensical.

To highlight the ridiculousness of identifying the wooden slats alone as the "essential characteristic" of the finished pencils, consider the following scenario: if the facts in this case were different, such that only the wooden slats were from China, but the core, ferrule and eraser were from a different third country, Commerce's reasoning in the Final Scope Ruling would still result in the China imparting the origin of the

finished pencils.  This is because according to Commerce, the "essential characteristics" would still be imparted by the wooden slats, based on their prefabrication for pencil production in China.  However, the wooden slats would never be capable of doing the one thing that a pencil must do, that is, allowing a user to write or draw.  Not only would the wooden slats require numerous production steps before becoming a finished pencil, but the wooden slats alone—without a graphite core—would contain no component capable of making the actual markings on a paper that constitute writing or drawing.

This scenario highlights that the essential component of a finished pencil cannot be the wooden slats alone.  Rather, consistent with the scope of the Cased Pencils order, the essential component of a finished pencil requires multiple manufacturing steps and is not viable as a pencil until a graphite core is encased in wood, *i.e.*, the pencil sandwich. Thus, the raw material inputs must be *combined* to create the essential component, and not simply combined haphazardly with rudimentary tools.  They must be methodically manufactured into a pencil sandwich, using numerous sophisticated machines in a series of carefully calibrated steps that occur in the Philippines.  If any of the raw

material inputs are not perfectly aligned following either the grooving, gluing, cutting, sandwiching, or shaping steps, they are immediately rejected at the manufacturing station where the defect occurred.

In any case, the "physical characteristics" factor is separate and distinct from the essential characteristics factor.[1]  Therefore, even if Commerce would have correctly analyzed the essential characteristics factor (which it did not), it still did not have license to simply ignore the significant physical changes imparted on the pencils' individual inputs in the Philippines.

This is exactly what Commerce did here: its analysis of the "physical characteristics" factor makes no mention of the numerous production steps that impart the most drastic physical changes: cutting numerous grooves into the wooden slats, creating pencil sandwiches

---

[1] Previously, Commerce's regulations enumerated as a single factor "the product properties, essential component of the merchandise, and intended end-use." *Bell Supply*, 888 F.3d 1222, 1228-1229 (Fed. Cir. 2018).  On September 20, 2021, Commerce issued new regulations listing "physical characteristics" and "essential characteristics of the product" as separate factors that the agency may consider.  *Scope Application*, Appx000080-000104 (*Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 F.R. 52,300, 52,321 (Sept 20, 2021)); *see also* 19 C.F.R. § 351.255(j)(1)(ii) and (j)(2).

with a gluing applicator and machine press, transforming the rectangular-shaped sandwiches into numerous hexagonal or cylindrical-shaped pencils, and sanding each pencil to create smooth exteriors. Without all these critical manufacturing steps, there would be no such thing as a pencil, it would be a block of thin wood without any ability to use it to write or draw.

In fact, Commerce's discussion of the "physical characteristics" factor focused almost entirely on the pencil *finishing* in the Philippines, not the multi-step pencil construction stage that takes place in a separate building, and that completely transforms the raw inputs. *See, e.g.*, *Final Scope Ruling*, Appx000431 (noting that "some physical characteristics" are imparted in the Philippines "such as color"). By selectively choosing to use as examples finishing steps that occur *after* pencil construction is complete, Commerce once again appeared to stretch its analysis to justify its foregone conclusion that the raw material inputs are not substantially transformed in the Philippines.

Commerce's blatant avoidance of the numerous manufacturing steps that occur in the Philippines, and the physical changes that result, was clearly unreasonable and contrary to law. Instead of doing

what it is required and thoroughly analyze the facts presented in the

Scope Application, Commerce shortcut its analysis on the pretense that

"essential characteristics" of a single input, the wooden slats, were

imparted in China.  Such an analysis is illogical and clearly

unsupported by substantial evidence on the record and is not in

accordance with law.

### 3.    Intended End Use

As School Specialty previously demonstrated to Commerce, the

manufacturing processes that occur in the Philippines undoubtedly

transforms the intended end use of the unprocessed inputs from China,

with which no user could expect to write or draw.  *Scope Application*,

Appx000014-000017, Appx000080-000104; *Rebuttal Comments*,

Appx000278.  Commerce, however, once again focused entirely on

certain components having a pre-determined end use.  *Final Scope

Ruling*, Appx000431 (graphite cores were "prefabricated in China to

proprietary chemical mixtures," and wooden slats are "imported from

China prefabricated to the specific dimensions . . .").  This analysis is

fundamentally flawed.

Commerce cites no authority for the proposition that inputs destined for a specific use cannot be substantially transformed in a third country. Nor do Commerce's regulations support turning the "intended use" factor into a bright line test for whether inputs undergo some measure of prefabrication. In fact, the regulations allow consideration of the "intended end-use *of the downstream product*," 19 CFR 351.225(j)(1)(iii) (emphasis added), not whether upstream inputs undergo prefabrication.

Fixating on the prefabrication of certain inputs—as opposed to analyzing their intended use vis-à-vis the finished product—negates the very purpose of this factor. This is especially true where, as here, the raw material inputs in no way share the same use as the finished products, because they cannot serve as a writing or drawing instrument, unlike the cased pencils manufactured in the Philippines.

Crucially, a brightline test that only looks to whether certain inputs have undergone some level of prefabrication make no logical sense in the present case. Indeed, wood must necessarily be cut to a specific dimension when logs are reduced in size in their initial stages of processing. The fact that wood may be logged for a specific purpose, or

cut with a specific end use in mind, does not obviate the need for significant manufacturing to then transform wooden slats into a finished product—*i.e.*, the grooving, gluing, compressing, shaping, sanding, varnishing, heading, stamping, tipping and sharpening required here. Similarly, the processing of pencil cores from "proprietary chemical mixtures" in China in no way undermines the significant manufacturing process required in the Philippines to transform all the raw inputs into finished pencils.

Commerce argues that if it were precluded from contemplating whether inputs have a pre-determined end use, the substantial transformation analysis would be "moot," because "the end use for highly tailored inputs could only be imparted when the product is in its completed stage." *Final Scope Ruling*, Appx000432. Here, Commerce completely misses the point. Commerce should not necessarily be "precluded" from contemplating pre-determined end use as part of a multi-factored, case-specific substantial transformation analysis. Commerce should be precluded from fixating on certain inputs having undergone some level of initial processing as grounds for essentially ignoring the significant manufacturing process that follows to

29

transform those inputs into a finished product.  This is especially true where, as here, components like wooden slats must necessarily undergo some level of processing in the country where the lumber originates prior to being manufactured into a finished product.

For these reasons, Commerce's analysis of the intended use factor was unsupported by substantial evidence.

      4.     Nature and Sophistication of Processing

Commerce found that the manufacturing in the Philippines "not to be highly sophisticated," and that it consisted of mere assembly of some components and additional processing of the "prefabricated" wooden slats.  *Id*.  Once again, Commerce fixated on the upstream processing – the so-called "prefabrication in China"—and completely ignored the sophisticated downstream processing that occurs.

Such an approach finds no support in Commerce's regulations or in the relevant case law.  In *Bell Supply*, for example, the Court held that in analyzing this factor, "mere comparison between the downstream and upstream processing does not aid in the substantial transformation inquiry."  348 F. Supp. 3d at 1291.  Even a *less* sophisticated downstream production process does not preclude

weighing this factor in favor of substantial transformation. *Id.* at 1290 ("A scenario could conceivably arise in which a downstream production process, though less sophisticated than the upstream production process, is still sophisticated for purposes of the substantial transformation test").

Contrary to this guidance from the Court, Commerce appeared to reason that the mere *existence* of upstream processing, the "prefabrication in China," precluded weighing the "sophistication of processing" factor in favor of substantial transformation. Instead of understanding the complex series of steps required in the pencil manufacturing process, Commerce summarily dismissed the numerous pencil construction steps in the Philippines as "additional processing" for the simple reason that they followed prefabrication of the wooden slats in China. *Final Scope Ruling,* Appx000432. For every manufactured product, there is always a first step of the production process. In this instance that first initial step is the fabrication of the wooden slats. Just because a product has a first step in the manufacturing process that starts the process does not mean that every other step that follows is mere "additional processing" as Commerce

assumes.  The second, third, fourth, etc. steps of the manufacturing

process are all essential to manufacturing the completed product and

cannot be ignored or dismissed as Commerce has done repeatedly in its

Final Scope Ruling.

As a result, Commerce failed to take account of the sophisticated

manufacturing and machinery required in the Philippines, including a

grooving machine, a glue distributor, a compressor to compress the

"sandwiches," a machine press for drying the sandwiches, a pencil

shaping machine, and a tumbler and heading machine for sanding.

*Scope Application*, Appx000080-000104.  Glossing over these critical

steps, seemingly because some level of upstream prefabrication

occurred, undoubtedly "stray{ed} from the focus of the inquiry, *i.e.*,

whether substantial transformation occurs as a result of the

downstream processing."  *Bell Supply*, 348 F.Supp.3d at 1290.

Equally egregious was Commerce's conclusion that "six of the nine

production steps that occur in the Philippines," *i.e.* varnishing, heading,

stamping, tipping, sharpening and packaging, "amount to simple

assembly of the cased pencils."  *Final Scope Ruling*, Appx000432.  This

reasoning implies that because most of the production steps consist of

mere assembly, the overall process does not rise to the requisite level of sophistication. Such an analysis is entirely misguided.

First, in making this conclusion, Commerce did not even refer to the critical pencil construction steps, *i.e.*, the grooving, gluing, cutting and shaping, involved in manufacturing the essential pencil sandwiches. The steps to which Commerce does refer in this portion of the Final Scope Ruling (varnishing, heading, stamping, tipping, sharpening and packaging) are those that occur *after* the raw material inputs have undergone pencil construction in the Philippines and *after* a substantial transformation has already occurred.

Second, even if all the steps identified by Commerce were truly "simple assembly" (which they clearly are not, *see*, *e.g.*, "sanding"), the idea of simply counting the number of steps as a proxy for sophistication of processing —without any analysis of each step's individual significance, and the degree of transformation involved—is overly simplistic, and completely disconnected from the facts of this case (or any case in which some manufacturing steps are more critical and significant than others), and it should result in remand of the Final Scope Ruling.

     5.     Cost of Production and Level of Investment

In analyzing "cost of production" and "level of investment," Commerce noted that School Specialty did not provide quantitative information in its Scope Application, and it therefore did not reach a determination with respect to these factors. *Final Scope Ruling*, Appx000433.

In so determining, Commerce ignored qualitative record evidence depicting the intricate processes and sophisticated machinery used in two separate buildings in the Philippines dedicated to pencil construction and pencil finishing, including a grooving machine, glue distributor, compressor, machine press, pencil shaping machine, tumbler and heading machine for sanding. This machinery undoubtedly adds significant value to the raw inputs, in that they are transformed into finished articles of commerce that can be sold as writing or drawing instruments. *Scope Application*, Appx000080-000104. Commerce should have considered this information, especially in the absence of "an established threshold for determining whether a certain percentage of the cost of production in a third country

represents a substantial transformation." *Final Scope Ruling*,

Appx000433.

Notably, if School Specialty were to import raw material inputs

instead of finished pencils, it would need significant capital investments

in the United States to develop the facilities and machinery required for

all of the pencil construction and pencil finishing steps described above,

including machinery to groove, glue, sandwich, cut, shape and sand the

inputs to be able to sell them as finished pencils. The fact that such

significant capital would be required in this scenario further

demonstrates the significant cost and investments expended in the

Philippines to manufacture finished pencils cannot be devalued or

disregarded as they were in Commerce's flawed analysis.

Finally, if Commerce required additional information to assess

these factors, it could have requested it. *See* 19 CFR §351.225(f)(3) ("the

Secretary may issue questionnaires and verify submissions received,

where appropriate"). The failure to do so, coupled with Commerce's

failure to consider relevant record evidence, rendered its analysis of this

factor incomplete and not in accordance with law.

In sum, Commerce's application of the substantial transformation test was flawed from the get-go. Rather than carefully considering the specific facts of the case, Commerce operated under the assumption that prefabrication of one single input in China precluded a finding of substantial transformation in the Philippines. Then, it worked backwards from this conclusion, carefully cherry-picking facts—*i.e.*, focusing on pencil *finishing*, not the pencil *construction* that actually transforms raw material inputs into pencil sandwiches—to characterize the processing in the Philippines as mere assembly. In short, Commerce changed the scope of the order in a manner that was contrary to its language and as a result, the Final Scope Ruling was unsupported by substantial evidence and contrary to law.

### B. Commerce's Final Scope Ruling Was Unsupported by Substantial Evidence and Contrary to Law, Because It Failed to Consider A CBP Ruling Directly on Point That Fairly Detracted From its Weight

As the Final Scope ruling noted, Commerce may consider determinations by other agencies. *Id.*, Appx000428. Here, where CBP analyzed the *exact same products* as those subject to the Final Scope Ruling, Commerce was required to at least take account of this determination. This was especially true given that the agencies'

diverging opinions have created an absurd result for pencil importers, whereby goods are considered country of origin Philippines for assessing import duties and country of origin China for assessment of antidumping duties.

Because Commerce failed to consider this evidence, the Final Scope Ruling was unsupported by substantial evidence.

### 1. The Substantial Evidence Standard Required Commerce to Consider Ruling N333392

"The substantiality of evidence must take into account whatever in the record *fairly detracts from its weight*, including contradictory evidence or evidence from which conflicting inferences could be drawn," including CBP rulings. *SolarWorld Americas, Inc. v. United States*, 910 F.3d 1216, 1225 (Fed. Cir. 2018) (quoting *Huvis Corp. v. United States*, 570 F.3d 1347, 1351 (Fed. Cir. 2009)) (emphasis added); *see also Worldwide Door Components*, 2024 WL 4439233, at *6.

In *SolarWorld*, for example, the Court noted that a Customs ruling is "one type of evidence for Commerce to consider," even if Commerce is not bound by the determination. *Id.* And in *SolarWorld*, importantly, Commerce <u>did</u> consider the Customs ruling in question. The plaintiff in that case urged Commerce to use Harmonized Tariff

Schedule ("HTS") subheading 7616.99 to value surrogate factors of

production, in accordance with a CBP ruling classifying the products at

issue in that provision. *SolarWorld*, 910 F.3d 1216 at 1225. Commerce

did not follow the CBP ruling, as it used different Thai HTS provisions

to calculate the surrogate value. However, Commerce still "considered

the evidence and *explained why the evidence should be afforded less*

*significance*." *Id.* (emphasis added). Specifically, Commerce explained

that the CBP ruling offered by plaintiff provided "*no explanation* ... as to

why the frames should be classified under {Thai} HTS {Heading 7616}."

*Id.* (emphasis in original).

In this case, Ruling N33392 is not only directly on point but

undoubtedly constitutes evidence that "fairly detracts" from the Final

Scope Ruling, but that Commerce simply failed to consider. *Id.* at 1225.

Ruling N33392 involved the exact same products as those at issue in

the Final Scope Ruling, certain #2 pencils, drawing pencils, and colored

pencils imported by School Specialty. And unlike in *SolarWorld*, in

which CBP analyzed HTS provisions for a different purpose than

Commerce (*i.e.*, determining duty rate, as opposed to valuing surrogate

factors of production), here, both agencies analyzed the same products

for the same reason—determining their country of origin.  Moreover,

Ruling N33392 reached a different conclusion—finding that the

merchandise in question is Philippines country of origin—and was

therefore "detracting" evidence.

The substantial evidence standard undoubtedly required

Commerce to consider Ruling N33392.  The fact that CBP analyzed

country of origin in Ruling N33392 under a different statute than

Commerce did not mean it could simply ignore it.  The obligation to

consider all evidence that "fairly detracts" from the substantiality of

evidence necessarily extends beyond binding authority.  Further, a

finding that Commerce should have considered Ruling N33392 would

not result in a broader requirement to consider CBP rulings in

Commerce's scope inquiries.  To the contrary, such a requirement would

be limited to the facts of this case, *i.e.*, where two agencies determined

the country of origin of the *same product* imported by the *same importer*

and reached contradictory results.

Contrary to the substantial evidence standard, Commerce failed to

even address the ruling, let alone determine its probative weight.

Undoubtedly, Commerce recognized that reaching a different outcome

than CBP would create significant logistical complications for School
Specialty, who had merely attempted to diligently confirm with both
agencies how to properly declare its goods.  Now, School Specially must
declare goods country of origin China for one purpose and country of
origin Philippines for another creating an absurd result.  While this
foreseeable conundrum did not require Commerce to follow CBP's
determination, it defies logic for Commerce to not even have considered
CBP's ruling.

> ### 2. Considering an Unrelated EAPA Case, But Not CBP's Country-of-Origin Ruling Involving the Same Importer and Same Products, Was Unreasonable.

Indicative of Commerce's factual cherry-picking is that it *did*
consider another determination from CBP and ignored the country-of-
origin ruling directly on point.  Specifically, Commerce addressed the
Notice of Determination of Evasion in Enforce and Protect Act ("EAPA")
Case No. 7238, placed on the record by Defendant-Intervenor.  *See* Final
Scope Ruling, Appx000428 ("we do not find CBP Ruling 7238, which
Dixon placed on the record, probative for determining the country of
origin of School Specialty's pencils in this scope inquiry").

Considering an unrelated EAPA case with facts drastically different from the present case, but not a binding CBP ruling directly on point, was clearly unreasonable. EAPA Case No. 7238 involved a different importer and a completely different set of facts. The EAPA case involved *finished* pencils imported from China to the Philippines, where they were repackaged into boxes labeled "Made in Philippines." *Petitioners Comments*, Appx000262. In stark contrast, School Specialty's Ruling N33392 involved: (1) the same importer that requested the Final Scope Ruling (School Specialty); (2) the same issue (country of origin); and (3) the same set of facts (raw material inputs imported from China to the Philippines and made into finished products through numerous manufacturing steps).

Because the Final Scope Ruling failed to consider Ruling N33392, it was not supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Crawfish Processors Alliance,* 483 F.3d at 1361 (internal quotations and citations omitted). As a result, Commerce's determination being challenged in the present case was unsupported by substantial evidence.

## VI.  CONCLUSION

For the reasons set forth above, Commerce's Final Scope Ruling was not supported by substantial evidence and not in accordance with law.  As a result, we respectfully request that the Court hold unlawful Commerce's affirmative finding of circumvention and remand this case for Commerce to revise the Final Determination in accordance with the Court's decision.

Respectfully submitted,

/s/ Nithya Nagarajan
Nithya Nagarajan
Jamie L. Shookman
HUSCH BLACKWELL LLP
1801 Pennsylvania Avenue, NW,
Suite 1000
Washington, DC 20006
nithya.nagarajan@huschblackwell.com
jamie.shookman@huschblackwell.com
(202) 378-2409

*Counsel to School Specialty, LLC*

Dated: November 8, 2024

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SCHOOL SPECIALTY, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES, | ) Before: The Honorable M. |
| | ) Miller Baker |
| Defendant, | ) |
| | ) Court No. 24-00098 |
| and | ) |
| | ) |
| DIXON TICONDEROGA COMPANY, | ) |
| | ) |
| | ) |
| Defendant-Intervenor. | ) |

## **PROPOSED ORDER**

On consideration of the motion for judgment on the agency record filed by School Specialty, LLC ("School Specialty"), Defendant and Defendant-Intervenor's response, and all other pertinent papers, it is hereby:

ORDERED that the motion filed by School Specialty is granted, and it is further

ORDERED that the final determination of the U.S. Department of Commerce ("Commerce") is set aside as unlawful, and it is further

ORDERED that Commerce's final determination is remanded for reconsideration in accordance with the Court's decision.


Dated: _____

New York, New York                    _____

                                      M. Miller Baker, Judge

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the Court's word limitation requirement. The word count for the foregoing brief, as computed by Husch Blackwell's word processing system (Microsoft Word), is 7,402 words.

Dated:  November 8, 2024                              <u>/s/ Nithya Nagarajan</u>
                                                       Nithya Nagarajan