IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

_____
                                              )
SCHOOL SPECIALTY, LLC,                        )
                                              )
              Plaintiff,          )
                                              )
        v.                    )
                                              )
UNITED STATES,                                )      Court No. 24-00098
                                              )
             Defendant,          )
                                              )
        and                   )
                                              )
DIXON TICONDEROGA COMPANY,                    )
                                              )
        Defendant-Intervenor.  )
_____)

**ORDER**

    Upon consideration of the plaintiff's Rule 56.2 motion for judgment on the agency record, defendant's opposition, and all other pertinent papers, it is hereby

    ORDERED that the plaintiff's Rule 56.2 motion for judgment on the agency record is denied; and it is further

    ORDERED that judgment shall issue for the United States.


Dated: _____        _____
          New York, New York                M. Miller Baker, Judge

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

_____

| | |
|---|---|
| SCHOOL SPECIALTY, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | Court No. 24-00098 |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| DIXON TICONDEROGA COMPANY, ) | |
| ) | |
| Defendant-Intervenor. ) | |

_____)

**DEFENDANT'S RESPONSE IN OPPOSITION TO
PLAINTIFF'S RULE 56.2 MOTION FOR
JUDGMENT ON THE AGENCY RECORD**

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

OF COUNSEL:

CHRISTOPHER ALAN KIMURA
Office of Chief Counsel for Trade
Enforcement & Compliance
U.S. Department of Commerce

FRANKLIN E. WHITE, JR.
AUGUSTUS GOLDEN
Attorneys, Commercial Litigation
Branch, Civil Division,
U.S. Department of Justice
(202) 305-5915

TABLE OF CONTENTS

PAGE

STATEMENT PURSUANT TO RULE 56.2 ...............................................2

    I.    Administrative Determination Under Review.......................2

    II.    Issues Presented for Review....................................................2

STATEMENT OF FACTS .........................................................................3

    I.    The Antidumping Duty Order...............................................3

    II.    Merchandise Subject to the Scope Inquiry............................3

    III.    The Scope Proceeding ............................................................4

SUMMARY OF ARGUMENT ....................................................................7

ARGUMENT .............................................................................................8

    I.    Standard of Review ..................................................................8

    II.    Legal Framework For Country Of Origin Scope Rulings.....10

    III.    Commerce Lawfully Conducted Its Substantial Transformation Analysis .........................................................12

    IV.    Commerce's Substantial Transformation Analysis Is Supported By Substantial Evidence And In Accordance With Law ................................................................................17

        A.    Commerce's Class Or Kind Determination..................18

        B.    Commerce's Physical Characteristics and Essential Characteristics Determination ......................................22

        C.    Commerce's End Use Determination ...........................31

i

D.     Commerce's Nature And Sophistication Of
        Processing Determination ..............................................35

E.     Commerce's Cost Of Production And Level Of
        Investment Determination ..............................................39

V.     Commerce Appropriately Considered CBP Rulings .............41

CONCLUSION .......................................................................................46

TABLE OF AUTHORITIES

PAGE(S)

CASES

*Am. Silicon Techs. v. United States,*
  261 F.3d 1371 (Fed. Cir. 2001) ................................................................. 9

*Atl. Sugar, Ltd. v. United States,*
  744 F.2d 1556 (Fed. Cir. 1984) ................................................................. 9

*Bell Supply Co. LLC v. United States,*
  888 F.3d 1222 (Fed. Cir. 2018) ............................................... 10, 11, 18, 25

*Bell Supply Co., LLC  v. United States,*
  348 F. Supp. 3d 1281 (Ct. Int'l Trade 2018) ................................. passim

*Bestfoods v. United States,*
  165 F.3d 1371 (Fed. Cir. 1999) ............................................................ 10

*Consol. Edison Co. v. NLRB,*
  305 U.S. 197 (1938) ................................................................................ 8

*Downhole Pipe & Equip., L.P. v. United States,*
  776 F.3d 1369 (Fed. Cir. 2015) ............................................................ 45

*E.I. DuPont De Nemours & Co. v. United States,*
  8 F.Supp.2d 854 (Ct. Int'l Trade 1998) .......................................... 10, 11

*F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States,*
  216 F.3d 1027 (Fed. Cir. 2000) ........................................................ 45-46

*Fujitsu Gen. Ltd. v. United States,*
  88 F.3d 1034 (Fed. Cir. 1996) ................................................................. 9

*Goldlink Indus. Co. v. United States,*
  431 F.Supp.2d 1323 (Ct. Int'l Trade 2006) ............................................ 9

iii

*King Supply Co. LLC v. United States*,
   674 F.3d 1343 (Fed. Cir. 2012)................................................................9

*Meridian Prods., LLC v. United States*,
   851 F.3d 1375 (Fed. Cir. 2017)................................................................8

*Mid Continent Nail Corp. v. United States*,
   725 F.3d 1295 (Fed. Cir. 2013)................................................................9

*Mitsubishi Electronics America, Inc. v. U.S.*,
   44 F.3d 973 (Fed. Cir. 1994).................................................................43

*Nat'l Hand Tool Corp. v. United States*,
   16 CIT 308 (1992), *aff'd*, 989 F.2d 1201 (Fed. Cir. 1993)....................33

*QVD Food Co. v. United States*,
   658 F.3d 1318 (Fed. Cir. 2011).......................................................39, 41

*Ran-Paige Co. v. United States*,
   35 Fed. Cl. 117 (1996)........................................................................33

*Sandvik Steel Co. v. United States*,
   164 F.3d 596 (Fed. Cir. 1998)..............................................................10

*SolarWorld Ams., Inc. v. United States*,
   910 F.3d 1216 (Fed. Cir. 2018).......................................17, 38, 42, 44, 45

*Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*,
   975 F.2d 807 (Fed. Cir. 1992)..............................................................17

*Ugine & Alz Belgium, N.V. v. United States*,
   31 C.I.T. 1536 (2007)..........................................................................43

*Uniroyal, Inc. v. United States*,
   542 F. Supp. 1026 (Ct. Int'l Trade 1982),
   *aff'd*, 702 F.2d 1022 (Fed. Cir. 1983) ...........................................passim

*United States v. Great Am. Ins. Co. of N.Y.*,
738 F.3d 1320 (Fed. Cir. 2013)...................................................24, 26, 39

*Venus Wire Indus. Pvt. V. United States*,
471 F.Supp.3d 1289 (Ct. Int'l Trade 2020)...........................................21

*Z.A. Sea Foods Priv. Ltd. v. United States*,
606 F. Supp. 3d 1335 (Ct. Int'l Trade 2022),
aff'd, No. 2023-1469, 2024 WL 2873428 (Fed. Cir. June 7, 2024) .......26

*Zenith Elecs. Corp. v. United States*,
988 F.2d 1573 (Fed. Cir. 1993).............................................................41

STATUTES
19 U.S.C. § 1516a(a)(2)(B)(vi) ...................................................................8
19 U.S.C  § 1516a(b)(1)(B)(i) .....................................................................8
19 U.S.C. § 1517(b)(4)................................................................................46
19 U.S.C. § 1673e(a)(2) .............................................................................10

REGULATIONS
19 C.F.R. § 351.225(f)(3)......................................................................40, 43
19 C.F.R. § 351.225(j) ......................................................................... passim

ADMINSTRATIVE DETERMINATIONS
*Antidumping Duty Order: Certain Cased Pencils from the People's Republic of China*,
59 Fed. Reg. 66909 (Dep't of Commerce Dec. 28, 1994) ......................3

*Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*,
86 Fed. Reg. 52,300 (Dep't of Commerce Sept. 20, 2021)............15, 43

*Erasable Programmable Read Only Memories (EPROMS) from Japan: Final Determination of Sales at Less than Fair Value*,
51 Fed. Reg. 39680 (Dep't of Commerce Oct. 30, 1986)......................25

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

_____

| | |
|---|---|
| SCHOOL SPECIALTY, LLC, )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES, )<br><br>Defendant, )<br><br>and )<br><br>DIXON TICONDEROGA COMPANY, )<br><br>Defendant-Intervenor. ) | Court No. 24-00098 |

_____)

## DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Defendant, the United States, respectfully submits this response in opposition to the motion for judgment upon the agency record filed by plaintiff School Specialty, LLC (School Specialty), challenging the U.S. Department of Commerce's (Commerce) final scope ruling in the antidumping duty order on certain pencils from the People's Republic of China (China). The Court should deny the motion because the scope

1

ruling is supported by substantial evidence and is otherwise in accordance with law.

## STATEMENT PURSUANT TO RULE 56.2

I.    Administrative Determination Under Review

The administrative determination under review is *Certain Cased Pencils from the People's Republic of China: Scope Ruling on Products Produced by School Specialty, LLC in the Philippines* (P.R. 30), issued May 6, 2024 (Final Scope Ruling).[1] *See* Appx000420-000434.

II.    Issues Presented for Review

1. Whether Commerce's determination of no substantial transformation was supported by substantial evidence and in accordance with law.

2. Whether Commerce sufficiently "considered" findings made by U.S. Customs and Border Protection by acknowledging that School Specialty had placed such findings on the record, noting such findings were performed under a different analysis and are not binding on Commerce, and then determining to give such findings no weight.

---

[1] "P.R." and "C.R." refer to documents in the public and confidential records, respectively.

## STATEMENT OF FACTS

I.    The Antidumping Duty Order

On December 28, 1994, Commerce published the antidumping duty order on certain cased pencils from China. *See Antidumping Duty Order: Certain Cased Pencils from the People's Republic of China*, 59 Fed. Reg. 66909 (Dep't of Commerce Dec. 28, 1994) (*Order*). The scope of the *Order* provides, in relevant part:

> Imports covered by the *Order* are shipments of certain cased pencils of any shape or dimension (except as described below) which are writing and/or drawing instruments that feature cores of graphite or other materials, encased in wood and/or man-made materials, whether or not decorated and whether or not tipped (*e.g.*, with erasers, etc.) in any fashion, and either sharpened or unsharpened.

II.    Merchandise Subject to the Scope Inquiry

The merchandise subject to this scope inquiry consists of three varieties of pencils: #2 pencils, drawing pencils, and colored pencils. #2 pencils consist of three subvarieties made of basswood with a graphite core and eraser: (1) a typical #2 pencil, which is a hexagonal writing utensil, measuring 7.5 inches by 0.25 inches in total; and (2) primary pencils, which are round, thicker at 7.5 inches by .344 inches, and have a larger graphite lead; and (3) starter pencils, which are

3

hexagonal and slightly thicker again at 7.5 inches by .40 inches, with a

larger graphite lead. Certain Cased Pencils: Scope Ruling Application

(P.R. 1) (C.R. 1) (Scope Application) at 9-10, Appx000009-000010.

Drawing pencils are also made of basswood, with a graphite core and

measure 7 inches by 0.25 inches, while colored pencils are also

hexagonal with a colored wax/clay core measuring 7 inches by 0.28

inches. All pencils of the above varieties have entered the United States

under the HTSUS subheading of 9609.10.0000, *i.e.*, "Pencils and

crayons, with leads encased in a sheath." *Id.* at Appx000010-000011; *see*

*also* Final Scope Ruling at 2-3, Appx000421-000422.

III.   The Scope Proceeding

    On June 7, 2023, School Specialty filed a scope ruling application

requesting that Commerce determine whether its #2 pencils, drawing

pencils, and colored pencils manufactured by School Specialty in the

Philippines using Chinese inputs and exported from the Philippines to

the United States are covered by the scope of the *Order*. *See generally*

Scope Application, Appx000001-000239. On July 10, 2023, Commerce

accepted School Specialty's scope application, and the scope inquiry was

deemed initiated. Final Scope Ruling at 1-2, Appx000420-000421.

On August 9, 2023, Dixon Ticonderoga Company (Dixon), the
petitioner, submitted comments on School Specialty's scope application,
arguing that School Specialty's products fall within the plain language
of the scope and that School Specialty failed to demonstrate that the
manufacturing process brought about a substantial transformation. *See
id.*, Appx000421. Following the removal of untimely-filed new factual
information, Dixon refiled its comments on February 29, 2024. *See
generally* Dixon's Comments on School Specialty, LLC's Application for
a Scope Ruling (P.R. 25) (C.R. 6) (Dixon's Comments), Appx000302-
000323. On August 30, 2024, School Specialty submitted rebuttal
comments arguing that the country of origin should be found to be the
Philippines and that the merchandise should not be subject to the
*Order*. *See generally* Rebuttal Scope Comments (P.R. 15) (C.R. 5)
(School Specialty's Rebuttal Comments), Appx000272-000301.

On May 6, 2024, Commerce published its Final Scope Ruling, which
concluded that School Specialty's merchandise are within the scope of
the *Orders*. *See generally* Final Scope Ruling, Appx000420-000434.
Commerce considered the record information under the country-of-
origin factors found in 19 C.F.R. § 351.225(j)(1) and (2) to determine

whether substantial transformation had occurred in the Philippines. *See id*. at 4, Appx000423.

Commerce found that a single factor – whether the processed downstream product (*i.e.*, cased pencils) is a different class or kind of merchandise than the upstream product (*i.e.*, cased pencil inputs) – weighed in favor of a finding of substantial transformation. *Id.* at 10-11, Appx000429-000430. Commerce found several factors – (a) the physical characteristics of the product (including its essential characteristics), (b) the intended end use of the product, and (c) the nature and sophistication of third-country processing – weighed against a finding of substantial transformation. *Id.* at 11-14, Appx000430-000433. Commerce did not reach a determination regarding the cost of production and level of investment factors, because the evidence provided by School Specialty was insufficient to make an adequate determination. *Id.* at 14-15, Appx000433-000434.

Based on the totality of all such factors, Commerce found that there was no substantial transformation in the Philippines. *Id.* at 14, Appx000433. Commerce also determined to give no probative weight to non-binding determinations made by U.S. Customs and Border

Protection (CBP) under a different analytical framework. *Id.* at 9,

Appx000428.

This appeal followed.

## SUMMARY OF ARGUMENT

Commerce's determination is supported by substantial evidence and

in accordance with law. Commerce properly analyzed the 19 C.F.R.

§ 351.225(j) factors by applying them to the specific facts of the

underlying scope inquiry. Commerce appropriately considered the class

or kind of merchandise, essential and physical characteristics of both

the products' inputs and final products themselves, the intended end

uses, and nature and sophistication of processing. Commerce also

appropriately found that there was insufficient evidence to analyze

costs of production and levels of investment.

Commerce's choice to not rely on rulings by U.S. Customs and Border

Protection (CBP) is also supported by substantial evidence and in

accordance with law. Commerce's regulation, 19 C.F.R. § 351.225(j),

expressly states such determinations are not binding on Commerce, and

each agency conducts different analyses for different purposes.

Accordingly, Commerce acted in accordance with law by acknowledging

that both School Specialty and Dixon had placed rulings from CBP in the record of the scope inquiry, correctly stating such rulings were not binding, and then giving such rulings no weight.

## ARGUMENT

### I.    Standard of Review

This Court may review a determination by Commerce "as to whether a particular type of merchandise is within the class or kind of merchandise described in an existing finding of dumping or antidumping or countervailing duty order." 19 U.S.C. § 1516a(a)(2)(B)(vi); *Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1379 (Fed. Cir. 2017). This Court must affirm "a Commerce scope ruling that is supported 'by substantial evidence on the record' and otherwise 'in accordance with law.'" *Meridian Prods.*, 851 F.3d at 1381 (citing 19 U.S.C § 1516a(b)(1)(B)(i)). Substantial evidence is "more than a mere scintilla" of relevant and reasonable evidence to support the underlying conclusions. *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). The requisite proof amounts to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" in light of "the entire record, including whatever fairly detracts from the

8

substantiality of the evidence." *Atl. Sugar, Ltd. v. United States*, 744

F.2d 1556, 1562 (Fed. Cir. 1984) (internal quotation marks and citation

omitted). "Even if it is possible to draw two inconsistent conclusions

from evidence on the record, such a possibility does not prevent

Commerce's determination from being supported by substantial

evidence." *Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1376

(Fed. Cir. 2001) (citing *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034,

1044 (Fed. Cir. 1996). "{T}he Court may not substitute its judgment for

that of the {agency} when the choice is between two fairly conflicting

views, even though the court would justifiably have made a different

choice had the matter been before it *de novo*." *Goldlink Indus. Co. v.*

*United States,* 431 F.Supp.2d 1323, 1326 (Ct. Int'l Trade 2006)

(citations and internal quotations omitted).

The Court grants "significant deference to Commerce's interpretation

of a scope." *Mid Continent Nail Corp. v. United States,* 725 F.3d 1295,

1300 (Fed. Cir. 2013) (citation omitted). This is because scope rulings

involve "highly fact-intensive and case-specific determination{s}," *King*

*Supply Co. LLC v. United States,* 674 F.3d 1343, 1345 (Fed. Cir. 2012),

making it "particularly within {Commerce's} expertise." *Sandvik Steel Co. v. United States,* 164 F.3d 596, 600 (Fed. Cir. 1998).

II.    Legal Framework For Country Of Origin Scope Rulings

When Commerce publishes an order, it defines the scope and "includes a description of the subject merchandise, in such detail as {Commerce} deems necessary." 19 U.S.C. § 1673e(a)(2). When Commerce is determining the country of origin, it may conduct a "substantial transformation" analysis of the product pursuant to 19 C.F.R. § 351.225(j) as a means of assessing country of origin of a finished product. "{S}ubstantial transformation occurs where, 'as a result of manufacturing or processing steps . . . {,} the {product} loses its identity and is transformed into a new product having a new name, character and use.'" *Bell Supply Co. LLC v. United States*, 888 F.3d 1222, 1228 (Fed. Cir. 2018) (*Bell Supply*) (citing *Bestfoods v. United States*, 165 F.3d 1371, 1373 (Fed. Cir. 1999)). The Federal Circuit has sustained Commerce's "substantial transformation" analysis as a means of assessing country of origin. *Bell Supply*, 888 F.3d at 1229 (citing *E.I. DuPont De Nemours & Co. v. United States*, 8 F.Supp.2d 854, 858 (Ct. Int'l Trade 1998)) (noting that "in determining if merchandise exported

10

from an intermediate country is covered by an antidumping order,
Commerce identified the country of origin by considering whether the
essential component is substantially transformed in the country of
exportation").

Both this Court and the Federal Circuit have explained that the
"substantial transformation rule provides a yardstick for determining
whether the process performed on merchandise in a country are of such
significance as to require that the resulting merchandise be considered
the product of the country in which the transformation occurred." *Bell
Supply*, 888 F. 3d at 1229 (citing *DuPont*, 8 F. Supp. 854, 858 (Ct. Int'l
Trade 1998)). To determine whether a product is transformed,
Commerce looks to 19 C.F.R. § 351.225(j), which lists relevant factors
that Commerce may consider, including "(1) the class or kind of
merchandise; (2) the nature and sophistication of processing in the
country of exportation; (3) the product properties, essential component
of the merchandise, and intended end-use; (4) the cost of
production/value added {in the third country}; and (5) the level of
investment {in the third country}." *Id.* at 1228-29.

11

III.    Commerce Lawfully Conducted Its Substantial Transformation
        Analysis

Commerce considered the facts of the record and the totality of the

circumstances to determine that School Specialty's merchandise

processed in the Philippines using inputs from China are not

substantially transformed. *See* Final Scope Ruling at 8-15, Appx000427-

000434. Therefore, Commerce lawfully conducted its analysis in

determining the country of origin of School Specialty's merchandise is

China. *See Bell Supply*.

School Specialty does not dispute Commerce's use of the substantial

transformation analysis to determine country of origin, or argue that

Commerce should have *not* used the substantial transformation

analysis and factors set forth in 19 C.F.R. § 351.225(j). *See generally*

School Specialty, LLC's Rule 56.2 Motion For Judgment On The Agency

Record (School Specialty Br.) at 17-36. Rather, School Specialty alleges

that Commerce "pick{ed} a single factor" – prefabrication – that

"appear{s} nowhere in its regulations" that "precluded" any finding of

substantial transformation "regardless of the specific facts and product

involved{.}" *See id*. at 17-19. School Specialty's arguments are without

merit.

School Specialty's argument that Commerce should not have considered "prefabrication" because it is "a factor nowhere to be found in {Commerce's} regulations" must fail. As we demonstrate below, Commerce's consideration of evidence of "prefabrication" was in accordance with law and School Specialty's arguments are nothing more than an inappropriate request for this Court to reweigh the evidence that was before Commerce.

First, Commerce's use of the term "prefabrication" and consideration of evidence of prefabrication does not conflict with 19 C.F.R. § 351.225(j). The regulation states that Commerce "may consider where the essential component of the product is produced or where the essential characteristics of the product are imparted." 19 C.F.R. § 351.225(j)(2). Evidence of prefabrication is directly relevant to such determinations, and thus Commerce is entitled to consider and weigh such evidence when making a country of origin determination. *Id*. Commerce, therefore, appropriately considered evidence of prefabrication in its analysis and found that "although the wooden slats input undergoes some additional processing in the Philippines, it is prefabricated in China to the specific dimensions to be placed in School

Specialty's pencil production machinery{,}" and thus "the essential characteristic of these wooden slats, *i.e.*, that they are to be used specifically for pencil production and associated production machinery, are imparted in China." Final Scope Ruling at 11, Appx000430 (citing Scope Application at Attachment VIII, Appx000079-000104). This analysis was consistent with the regulatory framework, as Commerce was considering evidence of prefabrication as part of its efforts to determine where an essential characteristic of School Specialty's products was "imparted." *See* 19 C.F.R. § 351.225(j)(2).

Second, even if School Specialty's argument that evidence of prefabrication is a new factor "nowhere to be found" in the regulation had merit, which it does not, 19 C.F.R. § 351.225(j) does not require Commerce to limit itself to examining substantial transformation in an identical fashion across proceedings, or to only consider the delineated factors in 19 C.F.R. § 351.225(j)(1)(i)-(vi). Specifically, 19 C.F.R. § 351.225(j) states that Commerce "may use *any* reasonable method" in determining country of origin. 19 C.F.R. § 351.225(j) (emphasis added). It also states that "{Commerce} may conduct a substantial transformation analysis that *considers relevant factors that arise on a*

14

*case-by-case basis*{.}" *Id.* (emphasis added). The regulation does not limit Commerce to only consider the factors listed in 19 C.F.R. § 351.225(j)(1)(i)-(vi), but rather identifies them as examples of such "relevant factors" by using the term "including{.}" *Id.*; *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* at 132 (2012) (regarding the presumption of non-exclusive "include"). The regulations purposely allow for such flexibility because "every product is different and every supply chain and production process is different." *Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52,300, 52,321 (Dep't of Commerce Sept. 20, 2021) (2021 *Preamble*) ("the listed factors are not exhaustive, because Commerce must retain the flexibility to adjust its country of origin analysis"). Accordingly, the Court should reject School Specialty's attempt to limit Commerce's flexibility in conducting country of origin determinations. *See* 19 C.F.R. § 351.225(j).

Third, School Specialty's argument that Commerce's analysis of prefabrication "precluded" any findings of substantial transformation is false. *See* School Specialty Br. at 17, 31, 36. Commerce's Final Scope

ruling never states that its findings regarding prefabrication rendered

any further analysis of the other factors meaningless. *See generally*

Final Scope Ruling, Appx000420-000434. To the contrary, Commerce

addressed each factor with citations to the record and explanations for

how it weighed each factor. *See, e.g., id.* at 13-14, Appx000432-000433

(comparing evidence of processing in Philippines to evidence of

prefabrication in China in determining that the "nature and

sophistication of processing in the third country or countries" factor

weighs against a finding of substantial transformation). Indeed, while

School Specialty accuses Commerce of "fixating" on prefabrication

School Specialty cites *no* evidence to support this allegation. *See, e.g.,*

School Specialty Br. at 28-30. Accordingly, the Court should disregard

School Specialty's characterization of Commerce's findings.

Finally, School Specialty's arguments regarding how Commerce

considered evidence of prefabrication is truly nothing more than a

disagreement with how Commerce weighed the evidence in the record

in making its scope ruling determination. *See, e.g.,* School Specialty Br.

at 12-13. School Specialty is, in effect, arguing that Commerce should

have given *less* weight to evidence of prefabrication, and more weight to

evidence that supported School Specialty's arguments. *See id.* at 19 (arguing that in "largely rely{ing}" on evidence of prefabrication, Commerce "ignored" other evidence). However, the Court's role is not to reweigh evidence. *See Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*, 975 F.2d 807, 815 (Fed. Cir. 1992) ("It is not for this court on appeal to reweigh the evidence or to reconsider questions of fact anew."); *see also SolarWorld Ams., Inc. v. United States*, 910 F.3d 1216, 1225 (Fed. Cir. 2018) (*SolarWorld*) (rejecting arguments that Commerce "*failed to give appropriate weight to*," and "*failed to appropriately consider*" evidence (internal citation omitted)).

For these reasons, this Court should reject School Specialty's arguments that Commerce's unlawfully considered prefabrication.

IV.   **Commerce's Substantial Transformation Analysis Is Supported By Substantial Evidence And In Accordance With Law**

School Specialty's discussion of the factors analyzed by Commerce pursuant to 19 C.F.R. § 351.225(j) fails to show that Commerce's determinations were not supported by substantial evidence or were contrary to law. School Specialty's characterizations and arguments against Commerce's findings are either mere disagreements with the

weight Commerce afforded to each of the substantial transformation factors or otherwise without merit, and should be rejected by this Court.

### A.    Commerce's Class Or Kind Determination

Commerce determined that the cased pencil inputs are a different class or kind of merchandise from the inquiry merchandise. Final Scope Ruling at 10-11, Appx000429-000430. Specifically, Commerce considered whether the inputs, which consist of items such as pencil cores, wooden sheaths, glue, erasers, and ferrules, are included "based on the actual language of the order." *Id.* (citing *Bell Supply*, 888 F.3d at 1228-9). Commerce disagreed with Dixon's claim that the production process in the Philippines "does not alter the physical characteristics to a significant degree." *See id.* Thus, Commerce found this factor weighed in favor of a finding that substantial transformation occurred. *Id.*

While School Specialty does not contest Commerce's finding, it argues that Commerce "failed to explain the reasonableness and weight" of this factor. School Specialty Br. at 20-21. School Specialty cites *Bell Supply*, arguing that Commerce is required to "explain how each factor weighs in the balance and why{}" and "how{}the factors upon which it relies support its determination." *Id.* (citing *Bell Supply Co.,*

18

*LLC v. United States*, 348 F. Supp. 3d 1281, 1289, 1295 (Ct. Int'l Trade 2018) (*Bell Supply II*)).

School Specialty's arguments are without merit. To the extent School Specialty is arguing that Commerce must quantify or mathematically compare the factors – i.e. further explain how it supposedly weighted this factor in relation to others – such an argument directly contradicts the nature of the totality of the circumstances analysis. *See Bell Supply II*, 348 F. Supp. 3d at 1295 ("a totality of the circumstances analysis eschews bright line rules for balancing").

Furthermore, the record shows that Commerce satisfied *Bell Supply II*. Commerce explained how each factor either supported or weighed against a determination of substantial transformation. *See id*. at 1289-90; *see also* Final Scope Ruling at 10-14, Appx000429-000433. Commerce then made its conclusion "{b}ased on the totality of the factors considered in the analysis of the substantial transformation criteria above{.}" Final Scope Ruling at 14, Appx000433. Commerce's rationale is therefore reasonably discernable: having examined the factors to determine whether they each individually weighed in favor of or against a finding of substantial transformation, Commerce then

19

considered those individual factors as a whole to come to the conclusion that "the totality of the factors" weighed against a finding of substantial transformation. *Id*. This is all that is required—an explanation how each factor supports a determination—to have a reasonably discernable rationale. *Bell Supply II*, 348 F.Supp.3d at 1289.

School Specialty appears to argue that Commerce should have instead stopped its substantial transformation analysis after determining the class or kind factor, ignored all other factors, and concluded that because the class or kind factor weighed in favor of transformation that a transformation *must* have occurred. *See* School Specialty Br. at 20 ("Commerce failed to explain how transforming inputs from one class or kind of merchandise to another did not rise to the requisite level of transformation . . . and why in this case, "class or kind" did not indicate that a substantial transformation had occurred."). Such an argument directly contradicts School Specialty's position that "picking a single factor" and relying solely on that factor to come to a determination "regardless of the specific facts and product involved, would undoubtedly be unsupported by substantial evidence and contrary to law." *Id*. at 17. Furthermore, School Specialty's argument

that Commerce should make a determination based solely on the class or kind factor must be rejected as contrary to Commerce's mandate to consider "relevant factors . . . on a case-by-case basis." *See* 19 C.F.R. § 351.225(j); *see also Bell Supply II*, 348 F. Supp. 3d at 1295 ("a totality of the circumstances analysis eschews bright line rules").

School Specialty cites no statute, regulation, or case to support its position that the class or kind factor outweighs all other factors, or that Commerce is required to identify a hypothetical process that would result in a finding of substantial transformation. *See* School Specialty Br. at 20. Notably, this Court has upheld Commerce's findings where class or kind weighs in the opposite of Commerce's ultimate substantial transformation determination. *See*, *e.g.*, *Venus Wire Indus. Pvt. V. United States*, 471 F.Supp.3d 1289, 1297 (Ct. Int'l Trade 2020) ("Commerce has used its substantial transformation test – and, indeed, found that a substantial transformation has occurred – when there was no change in the class or kind of merchandise{.}"). Indeed, 19 C.F.R. § 351.225(j) includes class or kind in a list of factors that may be considered, and does not require Commerce to make a substantial transformation finding if it finds the downstream product is a different

21

class or kind than the upstream product or to explain what hypothetical

scenario would constitute a substantial transformation. However,

accepting School Specialty's argument would elevate the class or kind

factor, one of six non-exclusive factors which Commerce *may* consider

on a case-by-case basis, above all other factors under 19 C.F.R.

§ 351.225(j).

Accordingly, the Court should reject School Specialty's claims

contesting Commerce's class or kind analysis.

B.    Commerce's Physical Characteristics and Essential
      Characteristics Determination

Commerce examined where the physical characteristics of the

product and the essential characteristics of the product are imparted,

and found this factor weighed in favor of a finding that School

Specialty's cased pencils are not substantially transformed. Final Scope

Ruling at 11-12, Appx000430-000431.

Commerce considered whether the production steps in the

Philippines changed the important qualities or use of the Chinese-origin

imported components. *Id.* The record before Commerce showed that

three of the four Chinese-origin inputs –graphite/color cores, ferrules,

and erasers – are not further processed in the Philippines. *Id.* (citing

Scope Application at 8-11, Appx000014-000017). The record further showed that "although the wooden slats input undergoes some additional processing in the Philippines, it is prefabricated in China to the specific dimensions to be placed in School Specialty's pencil production machinery." *Id.* (citing Scope Application at Attachment VIII, Appx000079-000104). Based on this evidence, Commerce concluded that "the essential characteristics of these wooden slats, *i.e.*, that they are to be used specifically for pencil production{…}are imparted in China{}" and that "these cased pencil components retain their original general physical and essential characteristics when assembled{.}" *Id.*

School Specialty argues that Commerce's analysis "failed to follow a logical series of steps." School Specialty Br. at 21. School Specialty alleges that Commerce "predetermined that it was going to conclude that there was no substantial transformation and then worked backwards to try and justify the result." *Id.* School Specialty criticizes Commerce for combining the analysis of "physical characteristics" with an analysis of "essential characteristics." *Id.* at 22. School Specialty also argues Commerce overly focused on the processing of the wooden slats

rather than the entire processing in the Philippines, and did not

acknowledge how processing in the Philippines causes physical changes

to individual inputs. *Id*. at 21-27. School Specialty's arguments are not

supported by the record or by any authority, and should be rejected.

First, as shown above, Commerce logically examined each of the

Chinese-origin inputs to determine where the physical and essential

characteristics of the product was imparted. School Specialty fails to

provide any argument as to how such an approach was illogical, and

has therefore waived any such argument. *See United States v. Great*

*Am. Ins. Co. of N.Y.*, 738 F.3d 1320, 1328 (Fed. Cir. 2013). ("It is well

established that arguments that are not appropriately developed in a

party's briefing may be deemed waived.").

Applying its essential characteristics analysis, Commerce properly

and logically found that for three of the four Chinese-origin inputs no

further processing occurs in Philippines. Final Scope Ruling at 11,

Appx000430. Further, with respect to the only remaining Chinese-

origin input – prefabricated wooden slats – for which some further

processing occurred in Philippines, Commerce logically concluded that

the essential characteristic was imparted during processing in China

24

based on record evidence that raw wood was prefabricated there into wooden slats of "specific dimensions" for use "specifically for pencil production and associated production machinery." *Id.*

Not only was Commerce's analysis logical, but it also complied with the Federal Circuit's instruction that the substantial transformation rule should provide "a yardstick for determining whether the processes performed . . . are of such significance" that the product's origin becomes where that processing took place. *Bell Supply*, 888 F.3d at 1229. Indeed, this Court has held that Commerce may not be limited to considering solely downstream processing. *See Bell Supply II*, 348 F.Supp.3d at fn. 9 ("Requiring Commerce to examine the downstream processing in a vacuum, without any reference to the production required to create the input for the third-country processing, would deprive Commerce of important data that goes to the heart of the country of origin inquiry.").

Commerce's logical approach also comports with its longstanding practice to consider whether the processing in the exporting country changes the important qualities or use of the component. *See Erasable Programmable Read Only Memories (EPROMS) from Japan: Final*

*Determination of Sales at Less than Fair Value*, 51 Fed. Reg. 39680,

39691-2 (Dep't of Commerce Oct. 30, 1986). Further, 19 C.F.R.

§ 351.225(j) states that "{Commerce} may use *any* reasonable method{,}"

and "may conduct a substantial transformation analysis that considers

relevant factors that arise on a *case-by-case basis*{.}" Commerce's

approach, therefore, was logical and in accordance with law.

Second, while School Specialty alleges that Commerce

"predetermined" its conclusion in this matter, it fails to provide any

support for this argument. *See* School Specialty Br. at 21. School

Specialty cites to a single page of the Final Scope Ruling, but that page

contains no statement that Commerce had predetermined its conclusion

and "worked backwards to try and justify the result" as School Specialty

alleges. *See id* (citing Final Scope Ruling at 11, Appx000430). As such,

this argument is not developed and is waived. *See Great Am. Ins.*, 738

F.3d at 1328; *see also Z.A. Sea Foods Priv. Ltd. v. United States*, 606 F.

Supp. 3d 1335, 1344 (Ct. Int'l Trade 2022) ("citations and assertions

alone do not constitute adequate argument"), *aff'd*, No. 2023-1469, 2024

WL 2873428 (Fed. Cir. June 7, 2024). Even if this argument was not

waived, the record shows that Commerce's decision was based on its

analysis of the totality of the evidence based on multiple relevant factors, some of which it found weighed in School Specialty's favor. *See generally* Final Scope Ruling, Appx000420-000434.

Third, it was not error for Commerce to consider physical characteristics and essential characteristics as a single factor. Both are factors Commerce *may* consider, and Commerce is not required to segregate factors for separate, individual analysis. *See* 19 C.F.R. § 351.225(j). Indeed, this Court has approved of determinations that have combined the analysis of these factors. *See*, *e.g.*, *Bell Supply II*, 348 F.Supp.3d at 1291-93 (finding that Commerce's determinations regarding the product properties, essential component, and intended end-use as a single factor were supported by substantial evidence).

Fourth, Commerce's analysis did not "focus{} only on wooden slats" as School Specialty alleges, and appropriately addressed the processing of inputs in the Philippines. *See* School Specialty Br. at 12, 22, 25-26. Commerce considered *all* of the Chinese-origin inputs used as components of School Specialty's pencils. *See* Final Scope Ruling at 11, Appx00430. Commerce first found that three of these four inputs retain

their original physical characteristics when assembled into a completed cased pencil before even addressing the wooden slats. *See id.*

Then turning to the wooden slats, the first thing Commerce did was acknowledge that "the wooden slat input undergoes some additional processing in the Philippines." *Id.* However, Commerce found this evidence insufficient to show a change in the important qualities of the component when compared to the evidence the slats were prefabricated in China to "specific dimensions" to fit in School Specialty's machinery. *See id.* (citing Scope Ruling Application Attachment VIII, Appx000079-000104); *see also* Scope Ruling Application Attachment VIII, Appx000092-000096 (showing processing of slats). Commerce acknowledged School Specialty's argument that essential characteristics of the components were changed by processing in the Philippines, but ultimately found such arguments unpersuasive in light of the record evidence that the inputs "are specifically tailored to be used only for finished cased pencils." Final Scope Ruling at 11-12,

Appx000430-000431.[2] Commerce, therefore, addressed the evidence of processing in the Philippines.

Indeed, while School Specialty alleges Commerce "makes no mention of the numerous production steps that impart the most drastic[3] physical changes" – cutting grooves into the prefabricated slats, placing graphite cores into such grooves to create pencil "sandwiches" that are then glued and pressed, and feeding the sandwiches into a shaping machine – the record shows otherwise. *Compare* School Specialty Br. at 25-26 *with* Final Scope Results at 10-11, Appx000429-000430 (quoting the International Trade Commission's description of such manufacturing process steps); *see also* Scope Ruling Application Attachment VIII, Appx000092-000096 (showing production steps). Commerce, therefore,

---

[2] After the wood slats are manufactured in China, they appear to have no other commercial use other than being an input for pencil production, as they are prefabricated "to the specific dimensions to be placed in School Specialty's pencil production machinery." Final Scope Results at 12, Appx000431; *see also* Scope Ruling Application Attachment VI, Appx000073 (stating that the slats are "ready for slat grooving production" when shipped to the Philippines after being manufactured from wood blocks in China).

[3] Although School Specialty characterizes the further changes as "drastic," the majority of the production steps in the Philippines, such as decoration, tipping with an eraser, shaping, or sanding, are not essential nor have any weight on Commerce's analysis in light of the scope's language, which indicates that the pencils can be "of any shape or dimension."

did not "focus{} almost entirely" on pencil finishing, as School Specialty alleges, but instead only addressed finishing as part of its analysis. *Compare* School Specialty Br. at 26 *with* Final Scope Results at 11-12, Appx000431 (determining that although "some physical characteristics{...}may be imparted{...}in the Philippines, such as the color, {they} are not the essential characteristics defined by the use of the merchandise").

Although School Specialty argues that without further processing the wooden slats "would never be capable of{...}allowing a user to write or draw{,}" School Specialty fails to identify why this should lead to a different conclusion regarding the product's essential characteristics. *See* School Specialty Br. at 24. This Court has held that even if a component of a product is not capable of acting as the finished product, it may still be "the very essence" of the finished product. *See*, *e.g.*, *Uniroyal, Inc. v. United States*, 542 F. Supp. 1026, 1030 (Ct. Int'l Trade 1982), *aff'd*, 702 F.2d 1022 (Fed. Cir. 1983).

Because most Chinese-origin inputs undergo no further processing in the Philippines and the wood slats are prefabricated to be placed in School Specialty's production machinery, Commerce's determination

that this factor weighed in favor of a finding that School Specialty's

cased pencils are not substantially transformed in Philippines was

supported by substantial evidence and in accordance with law.

Accordingly, the Court should reject School Specialty's claims contesting

Commerce's essential and physical characteristics analysis.

     C.    Commerce's End Use Determination

Commerce examined the intended end use of the downstream

product, finding that the record evidence showed "the graphite/color

cores are prefabricated in China to proprietary chemical mixtures" and

undergo no further processing in Philippines, and that "{a}lthough the

wooden slats undergo some further processing in the Philippines, they

are imported from China prefabricated to specific dimensions to be

placed in School Specialty's pencil production machinery." Final Scope

Ruling at 12, Appx000431 (citing Scope Application at 7, Appx000013,

and Attachment VIII, Appx000079-000104). Commerce, therefore,

appropriately concluded that this factor supported a finding of no

substantial transformation, as the Chinese-origin inputs were

predetermined for the specific use of pencil production at the time of

importation into the Philippines. *See id.*

School Specialty contends that the processing in the Philippines transforms the intended end use of the inputs from China, and that Commerce "focused entirely" on prefabrication. School Specialty Br. at 27. These arguments amount to disagreements with how Commerce weighed evidence, and fail to show that Commerce's determination was unsupported by substantial evidence or contrary to law.

While School Specialty argues that the processing in the Philippines "undoubtedly" transforms the Chinese inputs' end use because those cannot be used to write or draw,[4] this suggestion should be rejected as it imposes nonexistent criteria on Commerce's analysis. 19 C.F.R. § 351.225(j)(1) states that Commerce may consider in subsection (iii) the intended end-use of the downstream product. There is no additional language, precedent, case law, or context cited by School Specialty requiring that Commerce consider whether the input can perform as the final product, *i.e.*, that the input cannot write or draw. When an input is manufactured specifically to be processed into a final product,

---

[4] Even as a purely factual assertion, School Specialty's argument that the inputs produced in China cannot be used to write or draw is questionable. The Chinese-origin graphite core, for example, constitutes the portion of the pencil that does the writing or drawing.

its "end use" is not changed when that processing is accomplished, even if it could not fulfil the purpose of the final product before such processing. *See*, *e.g.*, *Uniroyal*, 542 F. Supp. at 1031 (intended use of shoe "upper" not changed when attached to an outsole to become footwear, as it was imported for that purpose); *Nat'l Hand Tool Corp. v. United States*, 16 CIT 308, 311–12 (1992), *aff'd*, 989 F.2d 1201 (Fed. Cir. 1993) (finding processing did not change intended use of imported components predetermined to be incorporated into a particular finished tool); *Ran-Paige Co. v. United States*, 35 Fed. Cl. 117, 119 (1996) (finding that an assembly process that (a) used a machine to attach handles to a pan, (b) secured the handles with rivets and fasteners, and (c) used a semi-automatic press, did not change the use of the components (handles, pans, rivets, and fasteners) because such use (cookware) was predetermined at the time of importation). It is, therefore, of no matter that the wooden slats cannot write or draw: they were manufactured and imported for the sole purpose of being processed into pencils, and therefore their end use did not change when School Specialty "did no more than complete the contemplated process." *Uniroyal*, 542 F. Supp. at 1031.

Thus, Commerce properly found that the inputs' end use was an important factor as record evidence indicated that pencil production requires highly specialized machinery that accepts only wooden inputs cut to specific dimensions, which are imparted in China. Final Scope Ruling at 12, Appx000431 (citing Scope Application at Attachment VIII, Appx000079-000104). Once the wooden slats have been prefabricated to such specific dimensions, the only remaining end use is to become a pencil. *Id.*

School Specialty attempts to downplay the role of its Chinese manufacturing and its importance in determining both the inputs' and the final product's end use, claiming that all wood undergoes some level of prefabrication. School Specialty Br. at 28-29. This argument ignores record evidence, as turning wood into slats of specific dimensions solely for use in School Specialty's machinery is not "some level of initial processing." *See* Scope Ruling Application Attachment VI, Appx000073.[5] Rather, it is specific manufacturing that defines and determines the

---

[5] Indeed, School Specialty's own evidence shows that [                                                                    ]. *Compare* School Specialty Br. at 28-29 *with* Scope Ruling Application Attachment VI, Appx000073.

ultimate end use for the input that extends all the way to the final product's completion. *See id.*; *see also Uniroyal*, 542 F. Supp. at 1031. Likewise, the graphite and color cores are also prefabricated in China "to proprietary chemical mixtures" necessary for use in School Specialty's products. Final Scope Ruling at 12, Appx000431. Further, as Commerce stated, if Commerce was precluded from considering predetermined end use as a factor, "the end use for highly-tailored inputs could only be imparted when the product is in its completed stage, thus rendering the substantial transformation analysis moot." *Id.* at 13, Appx000432. Simply put, if a component is imported to be used to create a specific product, and manufactured such that it has no other purpose, it cannot be said to have any end use other than becoming the final product. *See Uniroyal*, 542 F. Supp. at 1031.

Accordingly, the Court should reject School Specialty's claims contesting Commerce's end use analysis.

D.    Commerce's Nature And Sophistication Of Processing
      Determination

Commerce found the processing occurring in the Philippines did not rise to the level of sophistication that would satisfy the substantial transformation test. Final Scope Ruling at 13, Appx000432. In making

this determination, Commerce considered the various steps described on the record "regardless of where those steps occurred." *Id*. Commerce considered the "absolute nature and sophistication of third country processing{…}as well as the relative nature and sophistication of third country processing in the context of all production steps{.}" *Id*. Specifically, Commerce found that "six of the nine production steps that occur in the Philippines{…}amount to simple assembly of the cased pencil{…}that otherwise do not appear to confer notable changes to the input and/or finished pencils{.}" *Id*. (citing Scope Application at 9-11, Appx000015-000017). The remaining steps of grooving, sandwiching, and shaping relate to the wooden slats, but because of the significance of the prefabrication in China, Commerce found these additional steps not significant. *Id*.

School Specialty alleges that Commerce "fixated" on upstream processing and "completely ignored" downstream processing. School Specialty Br. at 30. As shown above, this is incorrect: Commerce analyzed *all* processing steps described by School Specialty in its scope application, considering the nature of each step of downstream processing. Final Scope Ruling at 13, Appx000432. Contrary to School

Specialty's accusation of fixation, Commerce's analysis went into *more*
detail regarding the downstream Philippine processing than it did on
the upstream Chinese processing. *See id.*

Furthermore, as this Court has held, Commerce would have been
deprived of important data if it had not considered both downstream
and upstream processing. *See Bell Supply II*, 348 F.Supp.3d at fn. 9
("Requiring Commerce to examine the downstream processing in a
vacuum, without any reference to the production required to create the
input for the third-country processing, would deprive Commerce of
important data that goes to the heart of the country of origin inquiry.").
Commerce's analysis, therefore, was supported by substantial evidence
and in accordance with law when it found the nature and sophistication
of the further processing of the wooden slats, in light of the
prefabrication in China, and the additional six steps of finishing did not
support a finding of substantial transformation. Final Scope Ruling at
13-14, Appx000432-000433.

School Specialty's additional complaint that Commerce did not
address "critical" pencil construction steps of grooving, gluing, cutting,
and shaping is incorrect. School Specialty Br. at 33. Commerce

explicitly noted those steps in its analysis, and cited School Specialty's

record evidence describing those steps. Final Scope Ruling at 13,

Appx000432 ("The three remaining production steps relate to the

additional processing of wooden slats, i.e., grooving, sandwiching, and

shaping.") (citing Scope Application at 9-11, Appx000015-000017).

Commerce analyzed the evidence regarding these steps, finding it did

not show that the processing in the Philippines was significant. *See id.*

To the extent that School Specialty is merely arguing that Commerce

should have reached a different conclusion, this should be rejected as an

inappropriate request for this Court to reweigh evidence. *See*, *e.g.*,

*SolarWorld*, 910 F.3d at 1225.

Similarly, School Specialty's allegation that Commerce "simply

count{ed} the number of steps" rather than analyze "each step's

individual significance," is incorrect and unsupported. *See* School

Specialty Br. at 33. In making this assertion, School Specialty cites no

language from Commerce's final ruling where it supposedly did this and

references no supporting evidence or controlling precedent for the Court

to consider or for the United States to respond to. This argument,

therefore, should be rejected as underdeveloped and waived. *See Great Am. Ins.*, 738 F.3d at 1328.

Accordingly, the Court should reject School Specialty's claims contesting Commerce's analysis of the nature and sophistication of the third country processing.

### E. Commerce's Cost Of Production And Level Of Investment Determination

In examining School Specialty's costs of production and level of investment, Commerce concluded there was insufficient record evidence, such as cost data, to make an evaluation. Final Scope Ruling at 14, Appx000433. Evidence available on the record included photos and descriptions of the work done in the Philippines. *Id.* (citing Scope Application at Attachment VIII, Appx000079-000104). However, this evidence was not indicative of costs and investment relative to that undergone in China. *Id.* School Specialty could have provided, but chose not to, information about its machinery and equipment purchases, registered capital, loans, employee numbers, and/or salaries. *Id.*; *see QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (*QVD Food Co.*) ("{t}he burden of creating an adequate record lies with interested parties and not with Commerce") (brackets omitted).

School Specialty alleges Commerce ignored "qualitative record evidence" of machinery that "undoubtedly adds significant value to the raw inputs." School Specialty Br. at 34, citing Scope Application at Attachment VIII, Appx000080-000104. This is incorrect, as Commerce reviewed School Specialty's submissions but could not sufficiently compare the costs and investments between the Philippines and China because School Specialty chose not to provide information sufficient to make such a comparison. Final Scope Ruling at 14, Appx000433. Indeed, School Specialty does not explain how Commerce could have used "qualitative" information to perform a comparative quantitative analysis. *Cf. Bell Supply* II, 348 F.Supp.3d at n.15. Instead, School Specialty relies on perfunctory explanations, cites no evidence it alleges Commerce overlooked, and does not provide the Court with any analysis on how Commerce's analysis or interpretation of the facts is incorrect.

School Specialty also points to 19 C.F.R. § 351.225(f)(3) to argue that Commerce erred by not asking for additional information, but this provision leaves it to Commerce's discretion whether to issue questionnaires. *See* 19 C.F.R. § 351.225(f)(3) ("{Commerce} *may* issue questionnaires . . . where appropriate." (emphasis added)). Further, the

Federal Circuit, contrary to School Specialty's argument, has held that

"{t}he burden of production {belongs} to the party in possession of the

necessary information." *Zenith Elecs. Corp. v. United States*, 988 F.2d

1573, 1583 (Fed. Cir. 1993); *see also QVD Food Co.*, 658 F.3d at 1324.

School Specialty, despite presumably having access to data regarding

its comparative investments in China and the Philippines, *chose* not to

provide any such information to Commerce as part of the scope inquiry

that School Specialty requested. School Specialty may not now complain

that its decision to withhold such information was somehow *Commerce's*

error, especially as Commerce only found that it could not make a

determination on this factor (rather than holding that the factor

weighed against a determination of substantial transformation).

Accordingly, the Court should reject School Specialty's claims that

Commerce failed to consider the evidence in the record or was required

to seek such evidence from School Specialty.

V.    Commerce Appropriately Considered CBP Rulings

School Specialty argues that Commerce was required to "take

account" of CBP Ruling N333392. School Specialty Br. at 36-37 (citing

*SolarWorld*). School Specialty argues that Commerce erred by "fail{ing}" to consider this evidence. *Id.*

However, the record shows that Commerce did "take account" and "consider" CBP's ruling by (1) acknowledging that School Specialty had placed the ruling in the record, Final Scope Ruling at 8, Appx000427 (noting School Specialty's rebuttal comments included arguments regarding "a recent CBP ruling regarding School Specialty itself in which CBP found that School Specialty's pencil products have gone through substantial transformation") (citing Appx000287), (2) noting that CBP rulings are performed under "a different analysis," *id.* at 9, Appx000428 (citing *Bell Supply II*, 348 F. Supp. 3d at n.6 (identifying different factors considered by CBP and Commerce)); and (3) noting that while it may consider such rulings, they are not binding, *id.* (finding a CBP ruling not probative for determining the country of origin in a Commerce scope inquiry).

Commerce's approach was correct and in accordance with law. Commerce "is not bound by the determinations of any other agency, including . . . country of origin marking rulings issued by {CBP}." 19 C.F.R. § 351.225(j). Commerce "has a different country of origin

analysis from CBP" with "a different purpose from that of CBP and is

applied specifically to determine the relevant point in a production and

processing chain where the country of origin of the products{} is

established." 2021 *Preamble*, 86 Fed. Reg. at 52321. Further, "CBP's

role in liquidating {antidumping} duties is 'ministerial' and CBP 'cannot

modify Commerce's determinations, their underlying facts, or their

enforcement.'" *Id.*, citing *Mitsubishi Electronics America, Inc. v. U.S.*, 44

F.3d 973, 977 (Fed. Cir. 1994). Because the purpose of each test is

different, CBP and Commerce country of origin analyses consider

different factors and may have different outcomes. *Cf. Bell Supply II*,

348 F.Supp.3d at n.6; *Ugine & Alz Belgium, N.V. v. United States*, 31

C.I.T. 1536, 1541 n.5 (2007).

Tellingly, School Specialty admits that Commerce only "*may* consider

determinations by other agencies," acknowledging that Commerce is not

*required* to consider such determinations. *See* School Specialty Br. at

36. School Specialty does not challenge Commerce's authority to "use

any reasonable method" and not to be bound by other agency

determinations in its country of origin analysis. *Id.* Indeed, when School

Specialty first identified Ruling N33392, it explicitly acknowledged that

Commerce was "not bound" by the ruling. *See* Appx000287.

Furthermore, School Specialty did not identify Ruling N33392 as

"evidence" of substantial transformation during the scope inquiry, but

merely as "the most informative of the cited {CBP} rulings." *Id*. School

Specialty therefore failed to exhaust any argument that Commerce was

"undoubtedly required" to consider Ruling N33392 during the scope

inquiry. *See* Appx000286 at n. 10 (emphasizing that Commerce is "*not*

*bound*" by CBP rulings).

School Specialty reliance on *SolarWorld* is also flawed. *SolarWorld*

held it was sufficient for Commerce to "consider{} the evidence and

explain{} why the evidence should be afforded less significance." 910

F.3d at 1225. That is precisely what Commerce did, acknowledging the

CBP rulings that had been identified by School Specialty and Dixon,

then stating that such rulings were based on a "different" analysis and

not binding. Final Scope Ruling at 8-9, Appx000427-000428. School

Specialty's argument that the Court should order Commerce to further

"consider" and "address" Ruling N33392 is substantively identical to the

arguments in *SolarWorld* that Commerce "failed to give appropriate

weight to," and "failed to appropriately consider" CBP rulings. *See*

44

*SolarWorld*, 910 F.3d at 1225. The Court should similarly reject such arguments as inappropriate requests for this Court to reweigh the evidence that was before Commerce. *See id.* (citing *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1377 (Fed. Cir. 2015)).

Finally, School Specialty's argument that Commerce only considered EAPA Case No. 7238 and not Ruling N33392 is simply incorrect. As shown above, Commerce acknowledged School Specialty included comments regarding Ruling N33392. *See* Final Scope Ruling at 8, Appx000427 (discussing "a recent CBP ruling regarding School Specialty itself in which CBP found that School Specialty's pencil products have gone through substantial transformation"). School Specialty seems to be focused on the explicit naming of EAPA Case No. 7238 in the Final Scope Ruling. *See id.* at 8-9, Appx000427-000428. However, from context it is clear that Commerce considered both Dixon and School Specialty's submissions regarding CBP cases, and found them all not probative due to their non-binding nature. *See id.*[6]

---

[6] Indeed, School Specialty does not provide any authority that a CBP determination such as Ruling N33392 "fairly detracts" from the substantiality of evidence Commerce considered in its scope ruling. *See* School Specialty Br. at 39. "Commerce's special expertise makes it the 'master' of the anti-dumping law{.}" *F.lli De Cecco Di Filippo Fara S. Martino*

Accordingly, the Court should reject School Specialty's arguments that Commerce's decision failed to consider CBP Ruling N33392 and was not supported by substantial evidence.

## CONCLUSION

For these reasons, the Court should deny plaintiff's motion for judgment on the agency record and sustain Commerce's scope ruling in its entirety.

---

*S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000). Furthermore, CBP is statutorily instructed to refer scope questions it cannot determine to Commerce and defer to Commerce's determination. *See* 19 U.S.C. § 1517(b)(4). Thus, it is Commerce's determinations on scope that control, not CBP's.

46

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

/s/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

OF COUNSEL:

CHRISTOPHER ALAN KIMURA
Office of Chief Counsel for Trade
Enforcement & Compliance
U.S. Department of Commerce

/s/ Augustus Golden
AUGUSTUS GOLDEN
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 507-6089
Facsimile:  (202) 307-0972
Augustus.J.Golden@usdoj.gov

January 7, 2025                Attorneys for Defendant

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the Rules of this Court and the Court's scheduling order in that it contains 8,365 words, including text, footnotes, and headings.

/s/ Augustus Golden