Slip Op. 25-97

## UNITED STATES
## COURT OF INTERNATIONAL TRADE

### Court No. 24-00098

SCHOOL SPECIALTY, LLC,

*Plaintiff*,

v.

UNITED STATES,

*Defendant*,

and

DIXON TICONDEROGA COMPANY,

*Defendant-Intervenor*.

Before: M. Miller Baker, Judge

## OPINION

[The court sustains Commerce's country-of-origin determination in part and remands in part.]

Dated: July 31, 2025

*Nithya Nagarajan* and *Jamie L. Shookman*, Husch Blackwell LLP, Washington, DC, on the briefs for Plaintiff.

*Brian M. Boynton*, Principal Deputy Assistant Attorney General; *Patricia M. McCarthy*, Director; *Franklin E. White, Jr.*, Attorney; and *Augustus Golden*, Attorney, Commercial Litigation Branch, Civil Division,

U.S. Department of Justice, Washington, DC, on the
brief for Defendant. Of counsel on the brief was *Christopher Alan Kimura*, Attorney, Office of Chief Counsel
for Trade Enforcement and Compliance, U.S. Department of Commerce, Washington, DC.

*Felicia Leborgne Nowels*, *Michael J. Larson*, and *Li X.
Massie*, Akerman LLP, Tallahassee, FL, on the brief
for Defendant-Intervenor.

    *Baker*, Judge: This case is about the making of pencils, a subject dear to the heart of one of the great economists of the 20th century, Milton Friedman.[1] An importer challenges the Department of Commerce's determination that pencils exported from the Philippines

---

[1] Friedman and his wife and co-author famously used the
example of a humble pencil to illustrate "how voluntary exchange enables millions of people to cooperate with one another." Milton & Rose Friedman, *Free to Choose* 11 (1980).
With the purchase of a single pencil, "we are exchanging a
little bit of our services for the infinitesimal amount of services that each of the thousands [of people] contributed toward" its production. *Id*. at 12–13. They describe the logging in the Pacific Northwest; "millwork involved in converting the logs to slats"; the mining of graphite in Ceylon;
the manufacture "of metal—the ferrule—near the top of
the pencil"; the making of the eraser with seed oil from Indonesia, "known in the trade as the plug"; and the assembly of these components in Wilkes-Barre, Pennsylvania. *Id*.
How did all this happen in the absence of "a central office
[giving] orders to these thousands of people"? *Id*. at 13.
"Adam Smith gave us the answer two hundred [and fifty]
years ago." *Id*.

are within the scope of an order imposing antidumping duties on such merchandise from China. As explained below, the court sustains the determination in part and remands in part for further proceedings.

I

An antidumping or countervailing duty order's "description of the subject merchandise" defines the products it covers. 19 U.S.C. § 1673e(a)(2). In issuing such decrees, Commerce's practice is to "describe[] the product 'within the scope of the order' by reference to its 'technical characteristics' and 'country of origin' . . . ." *BYD (H.K.) Co. v. United States*, Slip Op. 25-60, at 3, 2025 WL 1420318, at *1 (CIT 2025) (cleaned up and quoting *Canadian Solar, Inc. v. United States*, 918 F.3d 909, 913 (Fed. Cir. 2019)), *appeal pending*, No. 25-1937 (Fed. Cir.).

The nature of the global marketplace and the "everchanging varieties" of commodities available naturally prompt questions "as to whether a particular product is subject to" such orders. *Saha Thai Steel Pipe Pub. Co. v. United States*, 101 F.4th 1310, 1315 (Fed. Cir. 2024) (citing 19 C.F.R. § 351.225(a)). By regulation—the statute provides no such mechanism—a producer, importer, or other interested party uncertain about whether a product falls within an order's ambit may ask the Department for a ruling to clarify the decree's

terms. *See* 19 C.F.R. § 351.225(c)(1). Such a proceeding is called a "scope inquiry." *Id.* § 351.225(a).[2]

In a scope inquiry, Commerce may need to "determine the country of origin" of the merchandise at issue. *Id.* § 351.225(j). To do so, it "may" conduct a "substantial transformation analysis" to identify the finished product's country of origin. *Id.* § 351.225(j)(1).[3]

In that exercise, the Department "may . . . consider[] relevant factors that arise on a case-by-case basis, including" (i) whether "the processed downstream product is a different class or kind of merchandise than the upstream product," (ii) the "physical characteristics . . . of the product," (iii) the "intended end-use of the downstream product," (iv) the "cost of production/value added of further processing in the third country," (v) the "nature and sophistication of processing in" that nation, and (vi) the "level of investment"

---

[2] "This device is roughly analogous to the procedure by which a party uncertain of its rights or obligations may seek a declaratory judgment in federal court." *Fedmet Res. Corp. v. United States*, Slip Op. 24-136, at 3 n.1, 2024 WL 5088294, at *1 n.1 (CIT 2024) (citing 28 U.S.C. § 2201).

[3] The Department has discretion not to apply its substantial transformation test when it determines that this analysis is "not appropriate." *See* 86 Fed. Reg. 52,300, 52,321. In those cases, it can apply a "different, reasonable test." *Id.*; *cf. Canadian Solar*, 918 F.3d at 919 ("Commerce provided 'good reasons for' departing from the substantial transformation test . . . .") (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

there. 19 C.F.R. § 351.225(j)(1)(i)–(vi). It "also may consider" where the product's "essential component" is made or where its "essential characteristics" are imparted. *Id.* § 351.225(j)(2). These "listed factors are not exhaustive, because Commerce must retain the flexibility to adjust its . . . analysis when the facts on the record warrant" doing so. 86 Fed. Reg. at 52,321.[4]

In making a country-of-origin determination, the Department "is not bound by the determinations of any other agency," including Customs and Border Protection rulings. *Id.* § 351.225(j). Even so, such decisions are another "type of evidence for Commerce to consider," *SolarWorld Americas, Inc. v. United States*, 910 F.3d 1216, 1225 (Fed. Cir. 2018)—or, in the judicial vernacular, persuasive authority.

## II

In 1994, the Department issued an antidumping duty order covering pencils from China. 59 Fed. Reg. 66,909. It applies to "certain cased pencils of any shape or dimension which are writing and/or drawing

---

[4] As a result, Commerce has sometimes applied "different iterations of [its] substantial transformation analysis." *Id.* (internal quotation marks omitted).

instruments that feature cores of graphite or other ma-
terials encased in wood and/or man-made materials
. . . ." *Id.*[5]

School Specialty, LLC, is a pencil importer.
Appx000012. In 2023, it asked Commerce to declare
that the order—which is still in effect—does not cover
its pencils exported by a Philippine producer.
Appx000007–000239.[6]

As requested, the Department opened a scope in-
quiry. Appx000420–000421. Dixon Ticonderoga Com-
pany, the petitioner in the decades-ago investigation
that says it still makes pencils in this country,[7] sub-
mitted opposing comments. Appx000302–000323.

---

[5] In common parlance, "pencil" refers to cased pencils.
"Cased" merely means that an enclosure of some kind (usu-
ally wood) covers the graphite core that makes a mark. *See
Pencil*, Oxford English Dictionary (describing the "prevail-
ing sense" of "pencil" as "[a] tapered or pointed instrument
for writing or drawing, consisting of a slender stick of
graphite . . . enclosed in a long thin cylindrical piece of
wood, or fixed in a case of some other material (as metal,
plastic, etc.)"). Examples of "uncased" writing instruments
are crayons and chalk.

[6] According to the importer, it is "unaffiliated" with the
Philippine manufacturer. Appx000290.

[7] Dixon's self-description is unchallenged here and thus the
court assumes it to be true. This court previously sustained
Commerce's contested finding that at least for statutory

(footnote continues on next page)

Commerce determined that School Specialty's pencils fell within the scope of the order because they were not substantially transformed in the Philippines. Appx000433–000434.[8] It reached that conclusion by applying the criteria listed in 19 C.F.R. § 351.225(j).

The Department found that the first of the (j)(1) factors—whether "the processed downstream product is a different class or kind of merchandise than the upstream product"—suggested substantial transformation. Appx000429–000430. That was because the "inputs are a different class or kind of merchandise from the finished cased pencils subject to the Order." Appx000430.

The second (j)(1) factor—"the physical characteristics . . . of the product"—weighed against substantial transformation, as did the (j)(2) factor, "where the essential characteristics are imparted." Appx000430–000431. Commerce explained that as to these criteria,

standing purposes, the company's present-day manufacturing in this country is more than a Potemkin operation. *See Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327, 1337–45 (CIT 2017). The Federal Circuit, in turn, affirmed that decision via a non-precedential one-sentence order. *See* 779 F. App'x 744 (Fed. Cir. 2019); *see also* Fed. Cir. R. 36(a).

[8] Before considering country of origin, Commerce determined that School Specialty's "pencils exported from the Philippines . . . [met] the physical description set forth in the scope of the Order." Appx000428. That finding is undisputed here.

it "considers whether processing in the exporting country changes the important qualities or use of the component." Appx000430. Here, the relevant inputs "retain[ed] their original general physical and essential characteristics when assembled into a complete cased pencil." *Id.* In so finding, it expressly declined to apply a different substantial-transformation test used by Customs and urged by School Specialty. *Id.* For that reason, the Department found a Customs ruling proffered by Dixon not probative. Appx000428.[9]

The third and fifth (j)(1) factors—"the intended end-use of the downstream product" and the "nature and sophistication" of the third-country processing— also pointed against substantial transformation. Appx000431–000432, Appx000432–000433. As to the former, Commerce explained that "inputs were pre-determined for a specific end use at the time of importation." Appx000431. And for the latter, the Department said it examines "the nature and sophistication of third country processing," both absolutely and relatively, "in the context of all . . . steps required to produce the merchandise, including those in the order country." Appx000432. Here, "six of the nine production steps that occur[red] in the Philippines . . . amount[ed] to simple assembly of the cased pencils."

---

[9] In doing so, it thereby also implicitly rejected a Customs ruling tendered by School Specialty finding that the Philippines is the country of origin of its pencils. *See* Appx000427 (summarizing the importer's citation of "additional authorities").

*Id*. Although the remaining three—the "grooving, sandwiching, and shaping," *id*.—related to some additional processing of the wooden slats, absent prefabrication in China these materials would be "otherwise unusable." *Id*.

Finally, Commerce made no finding about the fourth and sixth (j)(1) factors—the "cost of production/value added of further processing" and the "level of investment" in the third country. Appx000433. It explained that School Specialty did not provide it with sufficient "quantitative information" to allow it to do so. *Id*. Although the importer did furnish photographs and narrative descriptions, it failed to supply information on "cost[s] . . . for each production step that takes place in the Philippines," "equipment purchases," "registered capital, short term loans, and . . . the number of employees" and their salaries. *Id*.

The Department's two-sentence conclusion stated that, "[b]ased on the totality of the factors," the relevant Chinese inputs were "not substantially transformed when used to produce cased pencils in the Philippines." *Id*. Consequently, it determined that School Specialty's pencils had "a country of origin of China." Appx000433.

### III

Invoking jurisdiction conferred by 28 U.S.C. § 1581(c), School Specialty brings this suit under 19 U.S.C. § 1516a(a)(2)(B)(vi). ECF 8, ¶ 2. Dixon

intervened to defend the agency decision. The parties have fully briefed the former company's motion for judgment on the agency record, which is ripe for decision.

In § 1516a(a)(2) actions, "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). The question is not whether the court would have reached the same decision on the same record. Rather, it is whether the administrative record as a whole permits Commerce's conclusion.

> Substantial evidence has been defined as more than a mere scintilla, as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. To determine if substantial evidence exists, we review the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence.

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (cleaned up); *see also SSIH Equip. S.A. v. U.S. Int'l Trade Comm'n*, 718 F.2d 365, 382 (Fed. Cir. 1983) (if Commerce makes a choice between "two fairly conflicting views," the court may not substitute its judgment even if its view would have been different "had the matter been before it *de novo*")

(quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

The court also reviews determinations to ensure the agency engaged in "reasoned decisionmaking," meaning its result must be "within the scope" of its authority and "the process" it uses to reach that outcome "must be logical and rational." *Michigan v. EPA*, 576 U.S. 743, 750 (2015). Reasoned decisionmaking requires the agency to "examine the relevant data and articulate a satisfactory explanation . . . including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). But courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.*

IV

School Specialty launches a broad attack on Commerce's determination. The importer challenges certain of the Department's findings, its balancing of the § 351.225(j) factors, and its asserted failure to address the Customs ruling that the Philippines is the country of origin of the pencils in question.

A

1

School Specialty disputes Commerce's findings about the "physical characteristics . . . of the *product*"

and "where the essential characteristics of the *product* are imparted." 19 C.F.R. § 351.225(j)(1)(ii), (j)(2) (emphasis added). It asserts that the Department erred in considering the characteristics of a single input—wooden slats—rather than of "a finished pencil" consisting of "a graphite core encased in wood." ECF 27, at 23. It argues that in light of the word "product" in the regulation, the agency's focus on the former rather than the latter was unlawful. *Id.* at 22–23.

To begin with, it's not true that Commerce only examined the physical characteristics of a "single input," the wooden slats. The Department considered and addressed the export-country processing of *each* "Chinese-origin input[]." Appx000430. Three of the four—"graphite/color cores, ferrules, and erasers"—were "not further processed in the Philippines," *id.*, meaning their essential characteristics were imparted *in China*. The agency focused on the wooden slats not because it was "justify[ing] its foregone conclusion," ECF 27, at 26, but because they were the sole component that underwent additional processing in the Philippines, Appx000430.

The court also disagrees with School Specialty's contention that (j)(1)(ii) and (j)(2) preclude the Department from considering characteristics of a product's inputs. The § 351.225(j) factors are "not exhaustive." 86 Fed. Reg. at 52,321; *see also* 19 C.F.R. § 351.225(j)(1) (stating that the agency "may" consider "relevant factors that arise on a case-by-case basis,

*including*" those enumerated) (emphasis added). Commerce plainly has the discretion to consider the physical and essential characteristics both of inputs and the final product.

Finally, School Specialty in effect argues that even if the Department properly considered the inputs' characteristics, its discounting the significance of the processing in the Philippines requires remand. The importer points to the grooving of slats; the wrapping of the graphite core with grooved slats that are then glued, called "sandwiching"; the rounding or hexagonal shaping of the "sandwich"; and sanding. *See* ECF 27, at 25–26; *see also* Appx000015–000017 (the scope application's description of the processing in that country).

Commerce, however, acknowledged that those and other processing steps are performed in the Philippines. *See* Appx000429–000430; *see also* Appx000431 ("[S]ome physical characteristics of the cased pencil may be imparted in the further production steps in the Philippines . . . ."). It explained that even with those measures, the wooden slats are "prefabricated in China *to the specific dimensions to be placed in School Specialty's pencil production machinery*." Appx000430 (emphasis added). That fact led it "to conclude that the essential characteristics of these wooden slats, i.e., that they are to be used specifically for pencil production and associated pencil machinery, are imparted in China." *Id*. As the other inputs—the "graphite/color

cores, ferrules, and erasers"—were not further pro-
cessed in the Philippines, overall "these cased pencil
components retain their original general physical *and*
essential characteristics when assembled into a com-
plete cased pencil." *Id.* (emphasis added).[10]

Although the further processing of the wood slats
in the Philippines emphasized by School Specialty
might have permitted the Department to reach the
contrary conclusion, it did not compel such a result.
"Where two different, inconsistent conclusions may
reasonably be drawn from the evidence in [the] record,
an agency's decision to favor one conclusion over the
other is the epitome of a decision that must be sus-
tained upon review for substantial evidence." *In re
Morsa*, 713 F.3d 104, 109 (Fed. Cir. 2013) (brackets
omitted) (quoting *In re Jolley*, 308 F.3d 1317, 1329
(Fed. Cir. 2002)). As the agency reasonably explained
why it found the "cased pencil components retain[ed]
their original general physical and essential charac-
teristics when assembled," Appx000430, the court sus-
tains this weighing of the evidence.

---

[10] School Specialty incorrectly charges that the Depart-
ment impermissibly blurred the (j)(1)(ii) "physical charac-
teristics" and (j)(2) "essential characteristics" factors to-
gether. *See* ECF 27, at 25. Although the agency discussed
the two together, in so doing it also recognized the distinc-
tion. *See* Appx000430–000431.

2

School Specialty assails Commerce's (j)(1)(iii) finding that the Chinese "inputs were pre-determined for a specific end use at the time of importation," Appx000431, arguing that the processing in the Philippines "undoubtedly" changes their end use since they cannot be used to write or draw when they leave China, ECF 27, at 27. It claims the Department improperly emphasized the manufacture of the unassembled components when the regulation provides only for consideration of the end use "*of the downstream product*, not whether upstream inputs undergo prefabrication." *Id.* at 28 (emphasis in original and citation omitted). Thus, in the importer's telling, the agency's fixation on the Chinese processing "ignor[es] the significant manufacturing" undertaken in the Philippines, *id.* at 29, thereby negating "the very purpose of this factor," *id.* at 28.

The court disagrees. As was its prerogative given its flexibility in applying the (j)(1)(iii) factor, the Department compared the "intended end use" of the Chinese inputs to that of the finished pencils. It found that the wooden slat and graphite/color core inputs have no other purpose than to be manufactured into pencils by the time they reach the Philippines. Appx000431. And although the former are processed further to create the finished product, "they are imported from China prefabricated to the specific dimensions" so they fit "School Specialty's pencil production machinery." *Id.* Commerce thus concluded that the components had

been processed in China "to the point where their physical and essential characteristics are specifically tailored for the assembly of cased pencils" such that this factor militated against a finding of substantial transformation. *Id.*

So, contrary to the importer's claims, the agency did not "fixate" on prefabrication of the wooden slats in China. Instead, the Department reasonably concluded that the "intended end use" of the inputs and the final product was the same. It is School Specialty's argument, not the agency's, that would "negate[] the very purpose of the factor," ECF 27, at 28, by "rendering the substantial transformation analysis moot, because the country of origin would always be where the product was finished" for highly tailored inputs like those here. Appx000432. Commerce's finding about intended end use is supported by substantial evidence.

3

School Specialty challenges Commerce's (j)(1)(v) finding that the "nature and sophistication" of the third-country processing weighed against substantial transformation. Appx000432. Recall that the agency reasoned that "six of the nine production steps that occur[red] in the Philippines . . . amount[ed] to simple assembly of the cased pencils." *Id.* And although the three others involved additional processing of the wooden inputs, these components were "prefabricated in China," absent which they would be "unusable." *Id.*

According to the importer, the agency erred by conducting a "mere comparison between the downstream and upstream processing," which the court has found "does not aid in the substantial transformation inquiry." ECF 27, at 30 (quoting *Bell Supply Co. v. United States*, 348 F. Supp. 3d 1281, 1291 n.9 (CIT 2018)). It claims the Department "summarily dismissed" the downstream steps for no other reason than "they followed prefabrication of the wooden slats in China." *Id.* at 31. And it asserts the agency's reasoning implies that the manufacturing steps undertaken in the Philippines did not rise to the "requisite level of sophistication" because they amounted to "mere assembly." *Id.* at 32–33.

School Specialty claims that logic is misguided for two reasons. First, "Commerce did not even refer to the critical . . . construction steps . . . involved in" making the pencils. *Id.* at 33. Second, even if all those steps were mere "assembly," the Department's "simpl[e] counting" of steps "as a proxy for sophistication of processing—without any analysis of each step's individual significance, and the degree of transformation involved—is overly simplistic, and completely disconnected from the facts." *Id.*

The court disagrees. School Specialty simply ignores the agency's critical finding that the Philippine processing steps emphasized by the importer—the "grooving, sandwiching, and shaping" of wooden slats, Appx000432—were not "transformative in their own

right," *id*. That's because these inputs were "prefabri-
cated in China to the specific dimensions" of the "pro-
duction machinery." *Id*. They "*possess[ed] no . . . use
outside of the manufacturing and assembly of cased
pencils*," and the importer did not contend otherwise.
Appx000433 (emphasis added). That undisputed find-
ing clears the low bar of substantial evidence.

Once again, although the record might have per-
mitted the Department to reach the conclusion urged
by School Specialty, it did not compel such a result.
The court therefore sustains Commerce's (j)(1)(v) find-
ing. *See Morsa*, 713 F.3d at 109.

4

School Specialty contests Commerce's (j)(1)(iv) and
(j)(1)(vi) findings that the record was "insufficient" for
the agency to evaluate the "cost of production/value
added" and the "level of investment" in the Philip-
pines. Appx000433. The Department reached that con-
clusion because the importer "did not provide quanti-
tative information" for these elements, which the
agency "typically need[s]" to make its evaluation. *Id*.

The latter complains that Commerce "ignored qual-
itative record evidence" which shows the Philippine
processing "undoubtedly adds significant value to the
raw inputs." ECF 27, at 34. Additionally, School Spe-
cialty argues that if the Department viewed the record
as inadequate, it should have requested the "addi-
tional information" it needed. *Id*. at 35. The importer

claims the agency's purported failure to consider the qualitative evidence, coupled with the failure to ask for whatever else it needed, "rendered its analysis . . . incomplete and not in accordance with law." *Id.*

The government responds that School Specialty's submissions, which lacked hard numbers, did not allow Commerce to "sufficiently compare the costs and investments between the Philippines and China." ECF 32, at 40. It argues that these inquiries are quantitative and that the importer "does not explain" how its qualitative submissions allowed such an analysis. *Id.* The government also notes that requesting supplemental information is committed to agency discretion and that the burden of production is on the party in possession of the information. *Id.* at 40–41.

The court agrees with the government. To begin with, subparagraph (j)(1)(iv) of the regulation speaks exclusively to quantitative, not qualitative, considerations.[11] It refers to the "cost of production/*value added of further processing* in the third country." 19 C.F.R. § 351.225(j)(1)(iv) (emphasis added). School Specialty relies on the phrase "value added of further processing" to contend that its photographs and written description showed "added value" in the Philippines. ECF 27, at 34. But "cost of production" in the same

_____

11 School Specialty does not dispute that subparagraph (j)(1)(vi) is concerned with quantitative considerations. *See* 19 C.F.R. § 351.225(j)(1)(vi) (referring to the "level of investment in the third country").

clause plainly refers to quantitative information. In the law, as in life, "birds of a feather flock together." Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 195 (2012). Under the canon of *noscitur a sociis*, when words "are associated in a context suggesting that [they] have something in common, they should be assigned a permissible meaning that makes them similar." *Id*. Here, to assign a qualitative meaning to "value added of further processing" would be incongruent with the adjacent phrase "cost of production."[12]

What's more, the importer is wrong to say the Department ignored the (irrelevant for these purposes) qualitative information on the record. The agency identified the "photos and descriptions of the work done in the Philippines," discussed the conclusions it could draw from that evidence, and found it "insufficient" because the record lacked the "quantitative" data necessary to "assess the level of investment required for the country-specific set of production steps

---

[12] This reading is reinforced by the neighboring subparagraph (v), which refers to "[t]he nature and sophistication of processing in the third country." 19 C.F.R. § 351.225(j)(1)(v). This phrase manifestly speaks to qualitative considerations. To read subparagraph (iv) as also encompassing those concerns would render subparagraph (v) "altogether redundant" and thereby violate the surplusage canon. Scalia & Garner, at 176.

School Specialty conducted." Appx000433.[13] That can hardly be characterized as "ignor[ing] qualitative record evidence." ECF 27, at 34.

Commerce also explained why it "need[ed] the underlying cost data" to evaluate these factors, and even listed the evidence School Specialty could have provided to assist that determination. Appx000433. The latter does not dispute that it had access to the relevant information at the time of the investigation. It cannot now complain that its own failure to provide that information is the *Department's* fault,[14] since the burden of creating an adequate record lay with the importer. *See QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011). The Department's finding

---

[13] In its reply brief, School Specialty complains for the first time that Commerce incorrectly characterized *it* as performing processing in the Philippines. *See* ECF 37, at 12 n.1. According to the importer, a third party did that work. *See* note 6.

At worst, any error by the Department in this regard was harmless, as its rationale did not turn on the Philippine producer's asserted affiliation. In any event, School Specialty waived the issue by failing to raise it sooner.

[14] *Cf. Marks v. Comm'r*, 947 F.2d 983, 986 (D.C. Cir. 1991) ("It is quite apparent that the reason the Markses kept the Commissioner—and the government—unapprised of their whereabouts was because they were fugitives from criminal prosecution. To turn around and blame the Commissioner for not finding them runs afoul of this court's developing 'chutzpah' doctrine.").

on these factors is thus supported by substantial evidence.

5

Finally, School Specialty is understandably happy with Commerce's finding under 19 C.F.R. § 351.225(j)(1)(i) that its "processed downstream products"—pencils—are "a different class or kind of merchandise than the upstream" Chinese-made inputs, as this supports a conclusion of substantial transformation. But it complains that the Department "failed to explain how it weighed" this determination "against other competing factors" on which the agency apparently relied. ECF 27, at 20.

The government first responds by observing, correctly, that Commerce need not "quantify or mathematically compare the factors," ECF 32, at 19, although that mischaracterizes School Specialty's argument. It next contends that the Department's rationale is reasonably discernable, as it considered its individual findings "as a whole to come to the conclusion that the 'totality of the factors' weighed against a finding of substantial transformation." *Id.* at 20.

The court disagrees. Commerce's determination lacks any discussion of how it balanced its various (j)(1) and (j)(2) findings—it simply announced its conclusion by talismanically invoking the "totality of the factors." Appx000433. We thus don't know on these facts *why* the agency concluded the various factors

pointing against substantial transformation out-weighed the one supporting a contrary finding.

The Department correctly noted that "[i]n conduct-ing a substantial transformation analysis, . . . the weight of any one factor can vary from case to case and depends on the particular circumstances unique to the products at issue." Appx000423. It is precisely for this reason that Commerce has a duty to explain its bal-ancing of the § 351.225(j) criteria when, as here, its findings point in opposite directions. *See Bell Supply*, 348 F. Supp. 3d at 1295 ("Although a totality of the circumstances analysis eschews bright line rules for balancing, Commerce must explain how each factor weighs in the balance and why."); *compare BYD*, Slip Op. 25-60, at 17, 2025 WL 1420318, at *6 (sustaining Commerce's circumvention determination under 19 U.S.C. § 1677j(b) because, among other reasons, the agency "reasonably explained why it assigned prepon-derant weight" to research and development, one of the five statutory factors to be balanced), *with Trina Solar (Vietnam) Sci. & Tech. Co. v. United States*, Slip Op. 25-62, at 12–13, 2025 WL 1556437, at **4–5 (CIT May 19, 2025) (remanding a circumvention determina-tion because the agency failed to explain its balancing of the relevant statutory factors). A remand is thus necessary for the agency to provide the missing expla-nation. As Judge Friendly observed, "The necessity for justification is a powerful preventive of wrong deci-sions." Henry J. Friendly, *Some Kind of Hearing*, 123 U. Pa. L. Rev. 1267, 1292 (1975).

B

School Specialty submitted a Customs ruling to Commerce in which the former agency found—based on the same fact pattern as here—that the pencils in question originated in the Philippines. Appx000299–000301.[15] The importer challenges the Department's failure to substantively address what it describes as that "undoubtedly" relevant determination, which it contends "fairly detracts from" Commerce's conclusion here. ECF 27, at 38–39 (internal quotation marks omitted).

The government responds that the Department acknowledged the ruling, noted that Customs uses a different substantial-transformation test,[16] and observed that the latter agency's findings are not binding

---

[15] Customs invoked 19 C.F.R. pt. 177 as its authority to issue this ruling. Appx000300. On this record, it's unclear on what basis School Specialty requested it.

[16] *See* 86 Fed. Reg. 52,300, 52,321 (Commerce explaining "that different Federal agencies apply different country of origin tests, depending on the context and purpose of the test . . . ."); *see also Bell Supply*, 348 F. Supp. 3d at 1287 n.6 (discussing the "'name, character and use' test, which evolved in Customs law"); Appx000300 (Customs ruling addressing School Specialty's pencils stating that "[s]ubstantial transformation requires that [t]here must be a transformation; a new and different article must emerge, having distinctive name, character, or use") (internal quotation marks omitted and citing *Anheuser-Busch Brewing Ass'n v. United States*, 207 U.S. 556, 562 (1908)).

on the former. ECF 32, at 42. Thus, it argues that Commerce reasonably determined that the Customs ruling was not probative. *Id*. at 45.

The court agrees that the Customs ruling was not probative, but for a different reason. That decision contained no analysis—the agency instead peremptorily announced its conclusion after stating the background facts and the applicable test: "The work performed in the Philippines on the various components that are made in China and shipped" to the former country "for manufacture into the completed pencils [has] effected a substantial transformation of those components and, therefore, the country of origin of the imported pencils is the Philippines." Appx000300. How and why the agency reached that conclusion is an unexplained mystery.

Because Customs's *ipse dixit* ruling lacks any "justification" for its result, *cf.* Friendly, 123 U. Pa. L. Rev. at 1292, it is not even persuasive authority. It thus does not fairly detract from Commerce's decision here, and the Department did not err by failing to further address it, for there was nothing else to say.

*    *    *

**Ct. No. 24-00098**                                          **Page 26**

The court sustains Commerce's determination in part and otherwise remands for further proceedings consistent with this opinion.

Dated:  July 31, 2025          /s/ *M. Miller Baker*
        New York, NY           Judge